# IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

———————————

STATE OF ARKANSAS, et al.,

Plaintiffs-Appellees,

v.

UNITED STATES DEPARTMENT OF EDUCATION, et al.,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the Eastern District of Missouri

———————————

## BRIEF FOR APPELLANTS

———————————

*Of Counsel:*

LISA BROWN
  *General Counsel*
  *U.S. Department of Education*

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney*
  *General*

SAYLER A. FLEMING
  *United States Attorney*

MELISSA N. PATTERSON
JACK STARCHER
DAVID L. PETERS
STEVEN A. MYERS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7232*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue, NW*
  *Washington, DC 20530*
  *(202) 305-8648*

## SUMMARY OF THE CASE AND
## STATEMENT REGARDING ORAL ARGUMENT

In April 2024, the Department of Education issued an omnibus rule making numerous changes to its regulations implementing Title IX of the Education Amendments of 1972. Among many other things, the Rule clarifies that discrimination on the basis of gender identity is necessarily also discrimination on the basis of sex (34 C.F.R. § 106.10); provides that a school violates Title IX when it differentiates on the basis of sex in a way that causes a person more than de minimis harm that Congress has not otherwise permitted (34 C.F.R. § 106.31(a)(2)); and recognizes that unwelcome sex-based conduct that is "subjectively and objectively offensive" and "so severe or pervasive that it limits or denies" a person's ability to participate in or benefit from an educational program constitutes prohibited hostile-environment harassment (34 C.F.R. § 106.2's definition of hostile-environment harassment). After finding that plaintiffs had just a "fair chance" of demonstrating that these three provisions were unlawful, the district court preliminarily enjoined the Department from enforcing the entirety of the Rule within six states and against one individual plaintiff.

The federal government respectfully suggests that oral argument would facilitate the Court's consideration of the case and proposes that the Court allocate 20 minutes per side.

# TABLE OF CONTENTS

**Page**

SUMMARY OF THE CASE AND STATEMENT
REGARDING ORAL ARGUMENT

INTRODUCTION ..................................................................................................1

STATEMENT OF JURISDICTION ....................................................................3

STATEMENT OF THE ISSUE.............................................................................3

STATEMENT OF THE CASE...............................................................................4

    A.    Title IX And The Rule ..........................................................4

    B.    Prior Proceedings.................................................................7

    C.    Related Proceedings...........................................................10

SUMMARY OF ARGUMENT............................................................................ 11

ARGUMENT ........................................................................................................ 18

I.    Plaintiffs Are Unlikely To Succeed On The Merits. ........................... 18

    A.    Standard Of Review...........................................................18

    B.    Gender-Identity Discrimination Is Necessarily Sex
        Discrimination...................................................................19

    C.    Section 106.31(a)(2)'s De Minimis Harm Standard Effectuates
        Title IX's Text And Structure. .......................................26

    D.    The Rule's Hostile-Environment Harassment Standard Is Lawful
        And Raises No First Amendment Concerns..............................33

II.    The Remaining Factors Weigh Against Preliminary Relief.................. 40

    A.    Plaintiffs Failed To Establish Irreparable Harm.........................40

      B.     The Equities And The Public Interest Weigh Against An Injunction. .........................................................................................43

III.    At A Minimum, The Injunction Is Overbroad. ..................................................... 44

CONCLUSION ......................................................................................................... 51

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                                                    **Page(s)**

*Able v. United States,*
44 F.3d 128 (2d Cir. 1995) .............................................................................19

*A.C. ex rel. M.C. v. Metropolitan Sch. Dist. of Martinsville,*
75 F.4th 760 (7th Cir. 2023) ..................................................................... 22, 29

*Adventist Health Sys./SunBelt, Inc. v. U.S. Dep't of Health & Human Servs.,*
17 F.4th 793 (8th Cir. 2021) .............................................................................. 29

*Arnold, Constable & Co. v. United States,*
147 U.S. 494 (1893) ........................................................................................ 25

*Beard v. Falkenrath,*
97 F.4th 1109 (8th Cir. 2024) .................................................................... 39, 40

*Bostock v. Clayton County,*
590 U.S. 644 (2020) ............................................... 2, 4, 5, 6, 12, 13, 20, 21,
22, 23, 24, 25, 26, 30, 48, 49

*Braidwood Mgmt., Inc. v. EEOC*
70 F.4th 914 (5th Cir. 2023) ............................................................................. 24

*Burlington N. & Santa Fe Ry. Co. v. White,*
548 U.S. 53 (2006) ........................................................................................... 27

*Califano v. Yamasaki,*
442 U.S. 682 (1979) ......................................................................................... 45

*Cannon v. University of Chi.,*
441 U.S. 677 (1979) ......................................................................................... 43

*Carter v. Chrysler Corp.,*
173 F.3d 693 (8th Cir. 1999) ............................................................................ 34

*Cruzan v. Special Sch. Dist. #1,*
294 F.3d 981 (8th Cir. 2002) ............................................................................ 32

*Dataphase Sys., Inc. v. C L Sys., Inc.,*
640 F.2d 109 (8th Cir. 1981) ............................................................................ 44

*Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.,*
526 U.S. 629 (1999) .............................. 4, 9, 15, 16, 34, 35, 35-36, 36

*Department of Educ. v. Louisiana*,
603 U.S. 866 (2024) ............................................................ 11, 20, 21, 50

*Does 1-2 v. Regents of the Univ. of Minn.*,
999 F.3d 571 (8th Cir. 2021) ............................................................ 48

*Du Bois v. Board of Regents of the Univ. of Minn.*
987 F.3d 1199 (8th Cir. 2021) ............................................................ 22

*Firearms Regulatory Accountability Coal., Inc. v. Garland*,
112 F.4th 507 (8th Cir. 2024) ............................................................ 12, 19

*Florida v. Department of Health & Human Servs.*,
19 F.4th 1271 (11th Cir. 2021) ............................................................ 17, 42

*Gebser v. Lago Vista Indep. Sch. Dist.*,
524 U.S. 274 (1998) ............................................................ 35, 36

*Gill v. Whitford*,
585 U.S. 48 (2018) ............................................................ 18

*Grabowski v. Arizona Bd. of Regents*,
69 F.4th 1110 (9th Cir. 2023) ............................................................ 22-23

*Grimm v. Gloucester Cty. Sch. Bd.*,
972 F.3d 586 (4th Cir. 2020), *as amended* (Aug. 28, 2020) ............................................................ 22, 29

*Gross v. FBL Fin. Servs., Inc.*,
557 U.S. 167 (2009) ............................................................ 24

*Harris v. Forklift Sys., Inc.*,
510 U.S. 17 (1993) ............................................................ 34, 37

*Hodel v. Virginia Surface Mining & Reclamation Ass'n*,
452 U.S. 264 (1981) ............................................................ 42

*Home Instead, Inc. v. Florance*,
721 F.3d 494 (8th Cir. 2013) ............................................................ 18

*Iowa Utils. Bd. v. FCC,*
109 F.3d 418 (8th Cir. 1996) ............................................................ 40

*Jackson v. Birmingham Bd. of Educ.*,
544 U.S. 167 (2005) ............................................................ 1, 2, 4, 26, 33

*Madsen v. Women's Health Ctr., Inc.*,
    512 U.S. 753 (1994) ................................................................ 10

*Maryland v. King*,
    567 U.S. 1301 (2012) ............................................................. 43

*Members of the City Council of the City of L.A. v. Taxpayers for Vincent*,
    466 U.S. 789 (1984) ................................................................ 39

*Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
    78 F.4th 1011 (8th Cir. 2023) ............................................... 41

*Muldrow v. City of St. Louis*,
    601 U.S. 346 (2024) ................................................................ 27

*National Endowment for the Arts v. Finley*,
    524 U.S. 569 (1998) ................................................................ 39

*Novus Franchising, Inc., v. Dawson*,
    725 F.3d 885 (8th Cir. 2013) ................................................. 42

*Parks v. Dunlop*,
    517 F.2d 785 (5th Cir. 1975) ................................................. 44

*Paskert v. Kemna-ASA Auto Plaza, Inc.*,
    950 F.3d 535 (8th Cir. 2020) ................................................. 34

*Pennhurst State Sch. & Hosp. v. Halderman*,
    451 U.S. 1 (1981) ................................................................... 42

*Planned Parenthood Minn., N.D., S.D. v. Rounds*,
    530 F.3d 724 (2008) ............................................................... 19

*Rowles v. Curators of the Univ. of Mo.*,
    983 F.3d 345 (8th Cir. 2020) ................................................. 39

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*,
    547 U.S. 47 (2006) ................................................................. 38

*S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*,
    696 F.3d 771 (8th Cir. 2012) ................................................. 43

*Snider v. City of Cape Girardeau*,
    752 F.3d 1149 (8th Cir. 2014) ......................................... 38, 39

*Watkins Inc. v. Lewis,*
    346 F.3d 841 (8th Cir. 2003) ................................................................ 40

*Winter v. Natural Resources Defense Council,*
    555 U.S. 7 (2008) ........................................................... 12, 18, 44

*Wolfe v. Fayetteville, Ark. Sch. Dist.,*
    648 F.3d 860 (8th Cir. 2011) .................................................... 22, 24, 34

## Statutes:

20 U.S.C. § 1234g(a) ......................................................................... 5

20 U.S.C. § 1681 ........................................................................... 4

20 U.S.C. § 1681(a) ........................................................ 4, 19, 22, 24, 27, 48

20 U.S.C. § 1681(a)(6) ..................................................................... 7

20 U.S.C. § 1681(a)(6)(A) ................................................................. 28

20 U.S.C. § 1681(a)(6)(B) ................................................................. 28

20 U.S.C. § 1682 ......................................................................... 4, 5

20 U.S.C. §§ 1682-1683 .................................................................. 4, 5

20 U.S.C. § 1686 ........................................................................ 4, 28

28 U.S.C. § 1292(a)(1) ..................................................................... 3

28 U.S.C. § 1331 .......................................................................... 3

42 U.S.C. § 2000e-2(a)(1) .............................................................. 5, 21

42 U.S.C. § 2000e-2(e) .................................................................... 25

## Regulations:

34 C.F.R. § 100.7(a)-(d) ................................................................... 5

34 C.F.R. § 106.2 ................................................... 2, 7, 33, 34, 37, 45

34 C.F.R. § 106.6(d) ...................................................................... 37

34 C.F.R. § 106.8(a) ................................................................ 5

34 C.F.R. § 106.8(a) (2020) ................................................... 47

34 C.F.R. § 106.8(c) ................................................................ 5

34 C.F.R. § 106.8(c) (2020) ................................................... 47

34 C.F.R. § 106.8(d) (2020) .................................................. 47

34 C.F.R. § 106.8(f) ................................................................ 5

34 C.F.R. § 106.9 ................................................................... 46

34 C.F.R. § 106.10 .............................................. 1, 6, 19, 45

34 C.F.R. § 106.16 ................................................................. 46

34 C.F.R. § 106.30 (2020) .................................................... 34

34 C.F.R. § 106.31(a)(2) .................. 1, 6, 7, 28, 30, 45, 49

34 C.F.R. § 106.33 ......................................................... 29, 30

34 C.F.R. § 106.40(b) ............................................................ 45

34 C.F.R. § 106.40(b)(3)(v) .................................................... 6

34 C.F.R. § 106.41(b) .............................................................. 7

34 C.F.R. § 106.44 .................................................................. 6

34 C.F.R. § 106.44(j)(2) ........................................................ 45

34 C.F.R. §§ 106.45-106.46 ............................................. 6, 45

34 C.F.R. § 106.48 ................................................................. 46

34 C.F.R. § 106.57(e)(2) ......................................................... 6

34 C.F.R. § 106.71 ................................................................. 45

34 C.F.R. § 106.71(a) (2020) ................................................ 47

45 C.F.R. § 86.1 (1975) ........................................................ 48

45 C.F.R. § 86.3(a)-(b) (1975) ........................................... 48

45 C.F.R. § 86.4(a) (1975) ............................................... 48

45 C.F.R. § 86.6(a) (1975) ............................................... 48

45 C.F.R. § 86.9(a) (1975) ............................................... 48

45 C.F.R. § 86.9(c) (1975) ............................................... 48

45 C.F.R. § 86.36(a)-(c) (1975) ......................................... 48

45 C.F.R. § 86.37(a)(2) (1975) .......................................... 48

45 C.F.R. § 86.37(b) (1975) ............................................. 48

45 C.F.R. § 86.38(a) (1975) ............................................. 48

45 C.F.R. § 86.39 (1975) ................................................ 48

45 C.F.R. § 86.51(a)(4) (1975) .......................................... 48

45 C.F.R. § 86.53 (1975) ................................................ 48

45 C.F.R. § 86.56(b) (1975) ............................................. 48

45 C.F.R. § 86.59 (1975) ................................................ 48

62 Fed. Reg. 12,034 (Mar. 13, 1997) ..................................... 36

Exec. Order No. 14,021, § 2(a),
    86 Fed. Reg. 13,803 (Mar. 11, 2021) ................................... 5

*Nondiscrimination on the Basis of Sex in Education Programs or Activities*
    *Receiving Federal Financial Assistance,*
    85 Fed. Reg. 30,026 (May 19, 2020) ................................. 5, 36

*Nondiscrimination on the Basis of Sex in Education Programs or Activities*
    *Receiving Federal Financial Assistance,*
    89 Fed. Reg. 33,474 (Apr. 29, 2024) ................. 1, 6, 7, 16, 20, 23, 26, 27, 28, 29, 30,
                                            31, 32, 33, 34, 37, 38, 39, 40, 45, 46, 47

*Revised Sexual Harassment Guidance: Harassment of Students by School*
    *Employees, Other Students, or Third Parties,*
    66 Fed. Reg. 5512 (Jan. 19, 2001) ................................... 33-34

**INTRODUCTION**

Title IX prohibits sex discrimination in federally funded education programs and activities. As the Supreme Court has made clear, "Congress gave the statute a broad reach" to cover a "wide range of intentional unequal treatment." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005). Congress also authorized the Department of Education to issue rules to effectuate the statute's sweeping prohibition on sex discrimination.

In April 2024, the Department exercised that delegated authority by issuing a rule that makes a variety of amendments to its Title IX regulations. *See Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33,474 (Apr. 29, 2024) (Rule). The Rule does many things, ranging from revising recordkeeping requirements to guaranteeing access to lactation spaces for breastfeeding students. Only three provisions of the Rule are challenged here—and in particular, those provisions are at issue only insofar as they apply to discrimination on the basis of gender identity.

The first provision (34 C.F.R. § 106.10) clarifies that discrimination on the basis of gender identity is necessarily discrimination on the basis of sex. The second (34 C.F.R. § 106.31(a)(2)) provides that schools violate Title IX when they differentiate on the basis of sex in a way that causes a person more than de minimis harm and when that differentiation lacks a statutory basis; as relevant here, it means that individuals must be permitted to use restrooms consistent with their gender identity. And the

third (34 C.F.R. § 106.2's definition of hostile-environment harassment) recognizes that unwelcome sex-based conduct that is "subjectively and objectively offensive" and "so severe or pervasive that it limits or denies" a person's ability to benefit from an educational program constitutes hostile-environment harassment.  All three provisions effectuate Title IX's "broad" prohibition on sex discrimination, *Jackson*, 544 U.S. at 175, and all three are consistent with precedent of this Court and the Supreme Court.

Plaintiffs' challenges to these provisions are meritless.  Section 106.10 flows directly from the plain text of Title IX and the reasoning of the Supreme Court's decision in *Bostock v. Clayton County*, which recognizes that it is "impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex."  590 U.S. 644, 660 (2020). Section 106.31(a)(2) likewise follows directly from the statutory text:  Unless the statute provides otherwise, it violates Title IX's general nondiscrimination mandate to treat a person differently on the basis of sex when that differential treatment causes more than de minimis harm.  And § 106.2's definition of hostile-environment harassment, which requires recipients to address conduct that limits or denies students the right to an education free from sex discrimination, is consistent with the standards that courts—including this one—have long applied in both the Title IX and Title VII contexts.

The district court nevertheless entered a sweeping preliminary injunction barring the Department from enforcing the entirety of the Rule in six states and against one individual plaintiff.  In so holding, the court erred in refusing to apply *Bostock*'s central teaching—*i.e.*, discrimination on the basis of gender identity is necessarily discrimination on the basis of sex—to the materially indistinguishable language of Title IX.  Beyond that, the court erroneously found that plaintiffs satisfied their burden of establishing irreparable harm sufficient to warrant preliminary relief.  And the court failed to justify an injunction against the entirety of the Rule when it found plaintiffs likely to prevail in showing only three discrete provisions to be unlawful.

This Court should vacate the preliminary injunction or, at a minimum, substantially narrow it.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the jurisdiction of the district court under 28 U.S.C. § 1331.  App. 18, R. Doc. 1, at 7, ¶ 18.  The district court entered a preliminary injunction on July 24, 2024, App. 155-56, R. Doc. 55, at 1-2, and defendants filed a timely appeal on September 20, 2024, App. 157-59, R. Doc. 63, at 1-3.  This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

In April 2024, the Department of Education issued a rule making numerous changes to its regulations implementing Title IX of the Education Amendments of

1972. After finding that plaintiffs had a "fair chance" of succeeding on challenges to only three of the new or changed provisions, the district court preliminarily enjoined the Department from enforcing the entire Rule within six states and against one individual plaintiff. The question presented is whether the district court's sweeping injunction represented an abuse of discretion.

The most pertinent cases are:

- *Bostock v. Clayton County*, 590 U.S. 644 (2020)

- *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999)

  The most pertinent statutory provisions are:

- 20 U.S.C. § 1681

- 20 U.S.C. § 1682

## STATEMENT OF THE CASE

### A. Title IX And The Rule

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "Congress gave the statute['s]" prohibition on sex discrimination "a broad reach" subject only to a "list of narrow" statutory exceptions and exclusions. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173, 175 (2005); *see* 20 U.S.C. §§ 1681(a), 1686. Congress also authorized the Department to "issu[e] rules,

regulations, or orders of general applicability … consistent with achievement of the objectives of the statute." 20 U.S.C. § 1682. And Congress established a detailed administrative enforcement scheme requiring the Department to first attempt to secure compliance through voluntary means before it may suspend or terminate federal financial assistance. *See id.* §§ 1234g(a), 1682-1683; *see also* 34 C.F.R. §§ 100.7(a)-(d), 100.8(a).

Since Title IX's enactment, the Department has promulgated regulations implementing the statute's prohibition on sex discrimination, including in 2020. *See Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020). One month after publication of the 2020 rule, the Supreme Court held that the prohibition on discrimination "because of … sex" in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1), necessarily encompasses discrimination because of sexual orientation and gender identity. *See Bostock v. Clayton County*, 590 U.S. 644, 660 (2020). Following *Bostock*, the President directed the Department to review the 2020 rule and existing guidance "for consistency with governing law." Exec. Order No. 14,021, § 2(a), 86 Fed. Reg. 13,803, 13803 (Mar. 11, 2021).

Following an extensive public engagement process, the Department issued the Rule. Among other things, the Rule streamlines requirements related to Title IX Coordinators, 34 C.F.R. § 106.8(a); revises recipients' notice of nondiscrimination and record-keeping requirements, *id.* § 106.8(c), (f); ensures access to lactation spaces for

breastfeeding students and employees, *id.* §§ 106.40(b)(3)(v), 106.57(e)(2); addresses a recipient's response to sex discrimination, *id.* § 106.44; and provides recipients additional flexibility regarding procedures to respond to claims of sex discrimination, including sex-based harassment, *id.* §§ 106.45-106.46.

The district court's preliminary injunction decision concerns other provisions of the Rule. Section 106.10 describes the scope of prohibited sex discrimination under Title IX. It provides that "[d]iscrimination on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." 34 C.F.R. § 106.10. As the Department explained, "discrimination on each of those bases is sex discrimination because each necessarily involves consideration of a person's sex, even if that term is understood to mean only physiological or 'biological distinctions between male and female.'" 89 Fed. Reg. at 33,802 (quoting *Bostock*, 590 U.S. at 655).

Separately, § 106.31(a)(2) details when separation or differentiation on the basis of sex constitutes prohibited sex discrimination. It sets out the general principle that Title IX permits "different treatment or separation on the basis of sex" only to the extent that such differential treatment or separation does not "discriminate[] … by subjecting a person to more than de minimis harm." 34 C.F.R. § 106.31(a)(2). Section 106.31(a)(2) further provides that a policy or practice that "prevents a person from participating in an education program or activity consistent with the person's gender identity subjects a person to more than de minimis harm on the basis of sex."

*Id.* The provision recognizes, however, that Congress carved out certain contexts in which a school may permissibly differentiate on the basis of sex even though greater than de minimis harm may result. *Id.*; *see, e.g.*, 20 U.S.C. § 1681(a)(6) (membership in fraternities or sororities); *id.* § 1686 (maintenance of sex-separate living facilities).

Finally, § 106.2 defines many terms, including "sex-based harassment." 34 C.F.R. § 106.2. One form of such harassment is "[h]ostile environment harassment," defined as "[u]nwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity (*i.e.*, creates a hostile environment)." *Id.* Section 106.2 explains that "[w]hether a hostile environment has been created is a fact-specific inquiry that includes consideration" of several enumerated factors. *Id.*

Nothing in the Rule alters the existing regulation regarding sex-separate athletic teams, which is the subject of a separate rulemaking. *See* 89 Fed. Reg. at 33,817; 34 C.F.R. § 106.41(b).

## B.    Prior Proceedings

Plaintiffs are six states—Arkansas, Missouri, Iowa, Nebraska, North Dakota, and South Dakota—and an individual minor, A.F. Plaintiffs filed this lawsuit challenging the Rule's treatment of gender-identity discrimination and sought preliminary injunctive relief, claiming that the application of certain Rule provisions to

sex-differentiated contexts such as bathrooms and pronouns will cause them irreparable harm. *See* R. Doc. 12, at 38-46.

On July 24, 2024, the district court granted plaintiffs' motion for a preliminary injunction and enjoined implementation of the entire Rule within the plaintiff states. After summarizing at length relevant legislative history, statutory text, and Supreme Court precedent, App. 108-30, R. Doc. 54, at 10-32, Add. 10-32, the district court first concluded that the term "sex" as used in Title IX refers to "the biological distinctions between males and females," App. 133, R. Doc. 54, at 35, Add. 35. Based on that understanding, the district court held that "plaintiffs have a *fair chance* of prevailing on their argument" that *Bostock*'s reasoning should not apply to Title IX. App. 134, R. Doc. 54, at 36, Add. 36. The district court also noted that Title IX, unlike Title VII, was "enacted pursuant to Congress's authority under the Spending Clause," and includes "several exceptions to the prohibition on sex discrimination that are not present in Title VII." App. 135-36, R. Doc. 54, 37-38, Add. 37-38.

The district court made clear that it did not consider any of plaintiffs' other arguments about the meaning of "sex" under Title IX, including all of plaintiffs' arguments about Title IX's application to athletics. App. 139, 142, R. Doc. 54, at 41, 44, Add. 41, 44. With respect to athletics, the district court acknowledged that the Rule "carves out an exception for athletics regulation, and there is a separate proposed rule that will amend the athletics regulation." App. 142, R. Doc. 54, at 44, Add. 44.

8

Turning to plaintiffs' challenge to the Rule's sex-based harassment provision, the district court concluded that plaintiffs had demonstrated a "*fair chance*" that the Rule's definition of harassment is inconsistent with the Supreme Court's decision in *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999). App. 140, R. Doc. 54, at 42, Add. 42. In addition, the district court found that plaintiffs had shown a fair chance of success on their argument that the Rule's harassment standard violates the First Amendment by chilling speech. App. 141, R. Doc. 54, at 43, Add. 43. For those reasons, the district court found that plaintiffs are sufficiently likely to succeed in showing that the Rule's harassment standard is unlawful. *Id.*

The district court next held that plaintiff states had adequately established irreparable harm because they showed they "will incur costs that cannot be recouped including costs" from updating policies and manuals and "hiring additional Title IX staff." App. 143, R. Doc. 54, at 45, Add. 45. In addition, the court found that plaintiff states had shown that the Rule would prevent enforcement of several state laws. App. 144, R. Doc. 54, at 46, Add. 46. And the district court found that the individual plaintiff, A.F., had shown her own irreparable harms in the form of harms to her sense of personal privacy and potential violation of her First Amendment rights. App. 144, R. Doc. 54, at 46, Add. 46. The district court held that the final preliminary injunction factors, the public interest and the balance of the equities, also favored plaintiffs because it is in the public interest to enjoin a rule that is contrary to law. App. 145, R. Doc. 54, at 47, Add. 47. In addition, the district court noted that

an injunction would preserve the status quo because the regulations currently in effect have been largely unchanged for the past 50 years.  App. 145, R. Doc. 54, at 47, Add. 47.

Finally, turning to the appropriate scope of the injunction, the district court acknowledged that "[i]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."  App. 148, R. Doc. 54, at 50, Add. 50 (quoting *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994)).  The district court therefore refused to issue a nationwide injunction, but nevertheless concluded that an injunction of the entire Rule was appropriate based on its view that the definition of sex "permeates the entire Rule."  App. 148, R. Doc. 54, at 50, Add. 50.

### C.    Related Proceedings

There are numerous similar challenges to the Rule pending in courts across the country.  In two of those cases—*Louisiana v. United States Department of Education*, No. 24-30399 (5th Cir.), and *Tennessee v. Cardona*, No. 24-5588 (6th Cir.)—the Solicitor General filed applications asking the Supreme Court to partially stay similar injunctions pending appeal.  *See* Application for a Partial Stay of the Injunction Entered by the United States District Court for the Western District of Louisiana, *Department of Educ. v. Louisiana*, No. 24A78 (U.S. July 22, 2024).  The Court denied the applications, reasoning that "[i]n this emergency posture in this Court, the burden is on the Government as applicant" to show entitlement to relief and that "[o]n this

limited record and in its emergency applications, the Government has not provided this Court a sufficient basis to disturb the lower courts' interim conclusions that the three provisions found likely to be unlawful are intertwined with and affect other provisions of the rule." *Department of Educ. v. Louisiana*, 603 U.S. 866, 868 (2024) (per curiam). The Court also stated that it "today accept[ed] that the plaintiffs were entitled to preliminary injunctive relief as to three provisions of the rule" they challenged, noting that the dispute before the Court concerned whether "other provisions of the new rule should still be permitted to take effect in the interim period while the Government's appeals of the preliminary injunctions are pending in the Courts of Appeals." *Id.* at 867. Justice Sotomayor—joined by Justices Kagan, Gorsuch, and Jackson—dissented, explaining that the "injunctions are overbroad" because they "bar the Government enforcing the entire rule—including provisions that bear no apparent relationship to [the plaintiffs'] alleged injuries." *Id.* at 869 (Sotomayor, J., dissenting in part).

## SUMMARY OF ARGUMENT

**I.** The district court erred in holding that the challenged Rule provisions— and, specifically, their application to certain contexts involving gender-identity discrimination—were likely unlawful.

**A.** At the outset, the district court fundamentally erred in preliminarily enjoining the Rule based on a finding that plaintiffs have only a "fair chance" of success on the merits. Entering preliminary relief absent a finding of actual likelihood

of success is irreconcilable with the Supreme Court's decision in *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008).  And while this Court has sometimes permitted preliminary injunctions to rest upon only a "fair chance" of success, precedent makes clear that the traditional likelihood-of-success test at a minimum applies "[w]hen a party seeks to enjoin a government regulation that is based on presumptively reasoned democratic processes."  *Firearms Regulatory Accountability Coal., Inc. v. Garland*, 112 F.4th 507, 517 (8th Cir. 2024) (quotation marks omitted).  That includes the Rule at issue here, which was issued by the democratically elected Executive Branch pursuant to an express delegation from Congress.

**B.**     The provision addressing the scope of prohibited sex discrimination (§ 106.10) properly recognizes that gender-identity discrimination is necessarily a form of sex discrimination.  That conclusion follows directly from the statute's plain text and the reasoning of *Bostock v. Clayton County*, 590 U.S. 644 (2020), which interpreted materially identical language in Title VII and concluded that gender-identity discrimination necessarily involves sex discrimination.  That is so, as *Bostock* made clear, even assuming that "sex" is understood to refer only to physiological or "biological distinctions between male and female."  *Id.* at 655.

None of the district court's reasons for distinguishing *Bostock* withstands scrutiny.  Title VII and Title IX set out identical but-for causation standards, and this Court has consistently looked to Title VII case law to interpret Title IX.  The texts of the two provisions demonstrate that they serve the same relevant purpose of

12

eradicating sex discrimination, and Title IX's various statutory exemptions do not suggest that Title IX's core prohibition against discrimination "on the basis of sex" can be read differently from Title VII's prohibition on discrimination "because of sex."  The district court ran afoul of basic rules of statutory interpretation by concluding that "sex discrimination" carries different meanings in materially identical statutes.

For largely the same reasons, the district court was wrong to conclude that the Rule is unlawful because Title IX was enacted pursuant to the Spending Clause.  That conclusion turns on the district court's erroneous conclusion that the Rule rewrites Title IX's definition of sex discrimination.  But as the Supreme Court made clear in *Bostock*, the conclusion that gender-identity discrimination is a form of sex discrimination flows clearly from the statutory text, even if the definition of sex is limited to physiological or "biological distinctions between male and female."  590 U.S. at 655.  Because Title IX itself unambiguously prohibits discrimination on the basis of gender identity, the Rule does not run afoul of any clear-statement principles premised on the Spending Clause.

**C.**     Section 106.31(a)(2) sets out the circumstances in which drawing sex-based distinctions constitutes prohibited discrimination.  While the district court did not address that provision separately from the provision addressing the scope of prohibited sex discrimination, it too is lawful.  Title IX does not prohibit all sex-based distinctions; rather, it bars only those distinctions that cause cognizable—*i.e.*, more

than de minimis—harm.  At the same time, Congress identified certain contexts, such as fraternity membership and maintenance of sex-separate living facilities, in which recipients may draw sex-based distinctions—even if they cause harm— notwithstanding Title IX's prohibition on sex discrimination.  Section 106.31(a)(2) thus effectuates Title IX's text and structure in providing that, unless a statutory basis for the exception applies, a recipient may not separate or differentiate on the basis of sex in a manner that subjects a person to more than de minimis harm.

The Rule also details how § 106.31(a)(2)'s standard applies to gender-identity discrimination.  The Rule explains that preventing individuals from accessing sex-separate facilities and activities consistent with their gender identity subjects individuals to cognizable harm.  Recipients thus must permit individuals to access sex-separate facilities or activities consistent with their gender identity, unless those programs or facilities fall within a congressionally recognized exclusion.  Applying those principles to restrooms, separation of facilities by sex generally does not violate Title IX because a cisgender male suffers no sex-based harm from being excluded from a comparable women's restroom, and vice versa.  But because restrooms are not exempt from Title IX's nondiscrimination mandate and denying individuals the ability to access sex-separate restrooms consistent with their gender identity causes cognizable harm, preventing transgender students from accessing restrooms that align with their gender identity would violate Title IX, as various courts have found.

The Department adequately accounted for privacy, safety, and compliance concerns related to § 106.31(a)(2)'s application to sex-separate facilities. The Rule affirmed the importance of privacy and safety and explained that nothing in the Rule prevents recipients from ensuring the privacy and safety of all students in sex-separate facilities, including by enforcing existing prohibitions on harassment and other forms of misconduct. The Rule further explained that the Department found no credible evidence that transgender students pose a particular risk to their cisgender peers or that the mere presence of a transgender person in a single-sex space compromises privacy interests. And the Rule explained that recipients may take reasonable measures to verify an individual's gender identity for purposes of compliance with § 106.31(a)(2).

**D.** The court further erred in finding that plaintiffs had a fair chance of success on their argument that the Rule's hostile-environment standard unlawfully departs in certain respects from the standard for judicially implied damages actions announced in *Davis ex rel. LaShonda D. v. Monroe County Board of Education*, 526 U.S. 629 (1999). In *Davis*, the Supreme Court addressed the "scope of liability in private damages actions" under Title IX's judicially implied right of action, *id.* at 641; it nowhere suggested that the standard for damages liability controls in the separate administrative-enforcement context. Indeed, the Court recognized that the standards may differ, distinguishing between "defin[ing] the scope of the behavior that Title IX

15

proscribes" and determining what conduct "support[s] a private suit for money damages." *Id.* at 639.

The district court further erred in finding that plaintiffs had a fair chance of success on their argument that § 106.2's definition of hostile-environment harassment contravenes the First Amendment. The standard announced in § 106.2 closely tracks the Department's longstanding interpretation of Title IX as well as the standard applied for evaluating hostile-environment harassment under Title VII. No court had previously found those standards in conflict with the First Amendment; to the contrary, various courts—including this one—have upheld those proscriptions on hostile-environment harassment without raising any First Amendment concerns. And if any doubt remained, the Rule makes clear that no provision requires or authorizes a recipient to violate anyone's First Amendment rights when addressing sex-based harassment.

The Rule's hostile-environment standard also is not overbroad or vague. The Rule defines the scope of prohibited harassment narrowly in terms of specific and required elements and in language with common usage in the nondiscrimination context. The Rule is not overbroad for recognizing that a school is obligated to address a hostile environment occurring "under its education program or activity, even when some conduct alleged to be contributing to the hostile environment occurred outside" the program or activity. 89 Fed. Reg. at 33,530. Nor is the standard so indeterminate as to fail to put the public on notice of what is prohibited.

Courts—including this one—have long applied analogous standards in both the Title VII and Title IX contexts without raising overbreadth or vagueness concerns, demonstrating that § 106.2's standard comports with the First Amendment.

II.    The remaining preliminary-injunction factors favor the government. Most importantly, plaintiffs failed to establish irreparable harm. The district court principally rested its finding of irreparable harm on the plaintiff states' cost to comply with the Rule—a theory that the states did not even advance. And while the states did complain that the Rule preempts conflicting state law, it is "black-letter law" that such preemption, standing alone, is not irreparable injury. *Florida v. Department of Health & Human Servs.*, 19 F.4th 1271, 1291 (11th Cir. 2021). Finally, while the district court believed that A.F. could suffer irreparable harm if the Rule were applied to require her to share a bathroom or locker room with a transgender individual or refer to such an individual using particular pronouns, A.F.'s declaration provided no basis to conclude that such asserted injuries were imminent. To the contrary, A.F. did not indicate that a transgender individual attends her school or that she has ever interacted with a transgender individual in any context. In contrast, the equities plainly favor the implementation of a regulation intended to fight sex discrimination in education.

III.    Finally, the preliminary injunction was at minimum substantively overbroad. The district court found only three provisions of the Rule invalid, and even then, only their application to specific contexts involving gender-identity discrimination. The Department's severability determinations make clear that the

17

remaining provisions could and should take effect even if those three provisions were enjoined. The district court's expansive injunction vastly exceeded what was necessary to redress "the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018).

**ARGUMENT**

## I. Plaintiffs Are Unlikely To Succeed On The Merits.

### A. Standard Of Review.

This Court "review[s] a district court's ultimate ruling on a preliminary injunction for abuse of discretion," but it reviews the "underlying legal conclusions de novo." *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013). A plaintiff seeking a preliminary injunction must satisfy the district court "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

Instead of finding that plaintiffs were "likely" to succeed on the merits, the district court found only that plaintiffs had a "fair chance" of doing so, *see, e.g.*, App. 130-34, 138-42, R. Doc. 54, at 32-36, 40-44, Add. 32-36, 40-44, even if that chance was "not necessarily greater than fifty percent," App. 130, R. Doc. 54, at 32, Add. 32 (emphasis omitted) (quotation marks omitted). Such a finding was plainly inadequate under *Winter*, which requires a showing of "likely" success. 555 U.S. at 20. And while this Court has applied the "fair chance" standard in some preliminary injunction

cases, it has unambiguously held that "[w]hen a party seeks to enjoin a government regulation that is based on presumptively reasoned democratic processes, … [it] must show it is likely to prevail on the merits." *Firearms Regulatory Accountability Coal., Inc. v. Garland*, 112 F.4th 507, 517 (8th Cir. 2024) (citation omitted) (quotation marks omitted); *see also Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (2008) (en banc) (explaining that "a more rigorous standard 'reflects the idea that governmental policies implemented through legislation *or regulations developed through presumptively reasoned democratic processes* are entitled to a higher degree of deference and should not be enjoined lightly'" (emphasis added) (quoting *Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995) (per curiam))).  Given that the challenged Rule was issued by the democratically elected Executive Branch pursuant to an express delegation from Congress, the traditional more-likely-than-not standard applies, and the district court unambiguously erred in premising a preliminary injunction upon a lesser showing.

## B.     Gender-Identity Discrimination Is Necessarily Sex Discrimination.

Title IX prohibits discrimination "on the basis of sex."  20 U.S.C. § 1681(a). Section 106.10 describes the scope of that prohibition, explaining that "[d]iscrimination on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity," 34 C.F.R. § 106.10, "because each necessarily involves

consideration of a person's sex, even if that term is understood to mean only physiological or 'biological distinctions between male and female,'" 89 Fed. Reg. at 33,802 (quoting *Bostock v. Clayton County*, 590 U.S. 644, 655 (2020)). Section 106.10 thus makes clear that Title IX's prohibition on sex discrimination covers actions like excluding a student from homecoming for being pregnant, giving a student detention for being gay, or barring a student from band for being transgender.

The district court's decision—mirroring plaintiffs' challenges—focused on § 106.10's inclusion of gender identity. App. 131-41, R. Doc. 54, at 33-43, Add. 33-43; *see* R. Doc. 12, at 19-37 (Plaintiffs' motion for preliminary injunction). On that score, the court rejected the Rule's recognition that the Supreme Court's reasoning in *Bostock*, when applied to the text of Title IX, compels the conclusion that discrimination based on gender identity is necessarily a form of discrimination "on the basis of sex." *See* App. 134-39, R. Doc. 54, at 36-41, Add. 36-41. But the reasons the district court gave for that conclusion have no foundation in the text of the statute and cannot be squared with the analysis in *Bostock*.[1]

---

[1] In denying the Department's stay applications in the related actions, the Supreme Court did not address—or even mention—the applicability of *Bostock* to Title IX's text. Nor did it otherwise resolve the merits of the Department's appeals from the preliminary injunctions. The brief per curiam order merely noted that "all Members of the Court today accept[ed]" that the plaintiffs there were entitled to preliminary relief as to the challenged provisions, a statement describing only a stay-stage determination regarding the preliminary injunctions, as the dissent made clear. *Department of Educ. v. Louisiana*, 603 U.S. 866, 868 (2024); *see id.* at 869 (Sotomayor, J., dissenting in part) ("For now, on the briefing and record currently before us, I would

*Continued on next page.*

1.     Section 106.10 reflects a straightforward application of *Bostock*'s

reasoning.  There, the Supreme Court confronted the provision of Title VII making it

unlawful "for an employer … to discriminate against any individual … because of

such individual's … sex." *Bostock*, 590 U.S. at 655 (quoting 42 U.S.C. § 2000e-2(a)(1)).

The Court explained that Title VII's "because of" language "incorporates the 'simple'

and 'traditional' standard of but-for causation." *Id.* at 656 (quotation marks omitted).

"[S]ex is necessarily a but-for cause" of discrimination on the basis of sexual

orientation or gender identity, the Court explained, "because it is impossible to

discriminate against a person for being homosexual or transgender without

discriminating against that individual based on sex." *Id.* at 660-61 (emphasis omitted).

Such discrimination would, for example, "penalize[] a person identified as male at

birth for traits or actions that it tolerates in an employee identified as female at birth."

*Id.* at 660.  That is true even on the assumption that "sex" in Title VII "refer[s] only to

biological distinctions between male and female," *id.* at 655, and even without having

---

stay the preliminary injunctions except as to the three [challenged] provisions … ."). The Court's and dissent's analysis concerned only the separate question of whether "other provisions of the new rule should still be permitted to take effect in the interim period while the Government's appeals of the preliminary injunctions are pending in the Courts of Appeals"—and again, addressed only whether the Department had satisfied its "burden … as applicant to show" in that "emergency posture" that it was entitled to a stay, without purporting to weigh in on the appeals that the Court noted were ongoing.  *Id.* at 867-68 (per curiam); *see id.* at 869, 876 (Sotomayor, J., dissenting in part).

to decide how the insight applies to sex differentiation in contexts such as "bathrooms, locker rooms, and dress codes," *id.* at 681.

*Bostock*'s reasoning applies with equal force to Title IX's prohibition against discrimination "on the basis of sex." 20 U.S.C. § 1681(a). As this Court has held, "the Supreme Court's interpretation of Title VII properly informs [this Court's] examination of Title IX." *Du Bois v. Board of Regents of the Univ. of Minn.*, 987 F.3d 1199, 1203 (8th Cir. 2021) (quotation marks omitted). That is because Title IX imposes a causation standard no more stringent than but-for causation under Title VII: while the two statutes use slightly different formulations ("because of sex" versus "on the basis of sex"), this Court has held that "these two phrases are treated interchangeably" such that they should be interpreted in concert. *Wolfe v. Fayetteville, Ark. Sch. Dist.*, 648 F.3d 860, 866 (8th Cir. 2011). And as *Bostock* made clear, "sex is necessarily a but-for cause" of discrimination on the basis of sexual orientation or gender identity. 590 U.S. at 661 (emphasis omitted). A school, no less than an employer, engages in sex discrimination when it "penalizes a person … for traits or actions that it tolerates" in persons identified as a different sex "at birth." *Id.* at 660. That is why various courts have concluded that, in light of *Bostock*, discrimination on the basis of sexual orientation and gender identity are necessarily forms of prohibited sex discrimination under Title IX. *See, e.g.*, *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020), *as amended* (Aug. 28, 2020); *A.C. ex rel. M.C. v. Metropolitan Sch. Dist. of Martinsville*, 75 F.4th 760, 769 (7th Cir. 2023); *Grabowski v. Arizona Bd. of Regents*,

69 F.4th 1110, 1116 (9th Cir. 2023). That conclusion does not depend, the Department explained, on viewing the term "sex" in Title IX to mean anything other than "physiological or 'biological distinctions between male and female.'" 89 Fed. Reg. at 33,802 (quoting *Bostock*, 590 U.S. at 655).

    **2.**    None of the district court's reasons for rejecting that conclusion is valid. The court first relied on its conclusion that the ordinary meaning of "sex" at the time of Title IX's passage referred only to "biological distinctions between males and females," and that the Rule's inclusion of gender identity as a prohibited basis of discrimination conflicted with that understanding. App. 133-34, R. Doc. 54, at 35-36, Add. 35-36. But § 106.10 does not purport to redefine "sex"—it simply applies the same analysis applied in *Bostock* to determine that discrimination on the basis of gender identity is necessarily discrimination on the basis of sex even assuming a definition of sex tied to "biological distinctions between male and female." *Bostock*, 590 U.S. at 655.

    The district court also dismissed *Bostock*'s relevance on the ground that the decision was about the meaning of Title VII. App. 134-36, R. Doc. 54, at 36-38, Add. 36-38. But *Bostock*'s core insight—that "it is impossible to discriminate against a person for being … transgender without discriminating against that individual *based on* sex," 590 U.S. at 660 (emphasis added)—applies equally to Title IX. If an employer "fires a transgender person who was identified as a male at birth but who now identifies as a female" yet "retains an otherwise identical employee who was identified

as female at birth," the employer has engaged in discrimination based on sex assigned at birth because it has "intentionally penalize[d] a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth." *Id.* Exactly the same is true under Title IX: a school that excludes or punishes a transgender girl for being transgender has engaged in discrimination "on the basis of sex," 20 U.S.C. § 1681(a), because it has penalized her for traits it would have tolerated in an otherwise identical student identified as female at birth.

The district court nowhere explained how Title VII's prohibition on discrimination "because of" sex means something different from Title IX's prohibition on discrimination "on the basis of" sex. And for good reason: this Court has squarely held that those "two phrases are treated interchangeably." *Wolfe*, 648 F.3d at 866. In *Bostock* itself, the Supreme Court substituted the phrase "on the basis of" for Title VII's "because of" formulation at least eight times. *See, e.g.*, 590 U.S. at 650 (noting that "in Title VII, Congress outlawed discrimination in the workplace *on the basis of* race, color, religion, sex, or national origin" (emphasis added)); *see Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 918 (5th Cir. 2023) (explaining *Bostock*'s holding that Title VII bars discrimination based on sexual orientation because it is "discrimination … 'on the basis of sex'"). And in other contexts, the Supreme Court has explained that the ordinary meaning of "the phrase 'based on' indicates a but-for causal relationship" and that the phrase has "the same meaning as the phrase, 'because of.'" *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009) (quotation marks omitted).

The district court also relied on the existence of statutory exceptions in Title IX, concluding that because those exceptions are not present in Title VII, the two statutes must have been motivated by different Congressional purposes. App. 136-37, R. Doc. 54, at 38-39, Add. 38-39. But broad invocations of statutory purpose cannot undermine the straightforward textual analysis set out above. In any event, the relevant purpose of both statutes is the same: to root out sex discrimination in all its forms, albeit in different settings. As for the fact that Title IX contains statutory provisions allowing sex separation in some contexts, those provisions hardly compel a different understanding as to the scope of prohibited sex discrimination in the first instance. Title VII also contains statutory exceptions, *see* 42 U.S.C. § 2000e-2(e) (bona fide qualifications), and has long been understood to allow certain forms of sex separation, like "sex-segregated bathrooms, locker rooms, and dress codes," *Bostock*, 590 U.S. at 681. Yet the Supreme Court still held that gender-identity discrimination is necessarily a form of sex discrimination. The presence of statutory provisions that allow for sex separation in certain contexts only reinforces the Rule's conclusion: they show that Congress understood that Title IX's general prohibition against sex discrimination otherwise could have been applied to such separation or differentiation. *See Arnold, Constable & Co. v. United States*, 147 U.S. 494, 499 (1893) ("[T]he exception of a particular thing from general words proves that, in the opinion of the lawgiver, the thing excepted would be within the general clause had the exception not been made." (quotation marks omitted)).

**3.**     Finally, the district court erred in concluding that the Rule is suspect

pursuant to the Spending Clause.  App. 135-36, R. Doc. 54, at 37-38, Add. 37-38.

That holding simply repeats the district court's erroneous conclusion that the Rule

somehow redefined "sex" to be synonymous with gender identity.  As already

explained, discrimination on the basis of gender identity is necessarily a form of sex

discrimination covered by Title IX's text, even if sex "is understood to mean only

physiological or 'biological distinctions between male and female,'" 89 Fed. Reg. at

33,802 (quoting *Bostock*, 590 U.S. at 655); *see supra* pp. 21-23.  Because Title IX itself

unambiguously prohibits all forms of discrimination on the basis of sex—including

discrimination on the basis of gender identity—clear-statement principles premised on

the Spending Clause have no bearing on the scope of prohibited discrimination in

§ 106.10.  As the Supreme Court has explained in rejecting other Spending Clause

challenges to Title IX, the statute places recipients of federal funds clearly on notice

that they must comply with the prohibition on sex-based discrimination in all of its

forms.  *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174-75 (2005) (holding that

Title IX's private right of action encompasses retaliation claims even though the

statute does not specifically mention retaliation).

**C.    Section 106.31(a)(2)'s De Minimis Harm Standard
        Effectuates Title IX's Text And Structure.**

Section 106.31(a)(2) is the provision detailing when otherwise permissible

separation or differentiation on the basis of sex constitutes prohibited sex

discrimination. It provides that subject to certain congressionally recognized exceptions, recipients may not differentiate on the basis of sex when doing so causes more than de minimis harm. The district court failed to separately consider § 106.31(a)(2), and that failure reflects the district court's fundamental misunderstanding of the Rule's approach to gender identity.

1.     Section 106.31(a)(2) effectuates Title IX's plain text, which prohibits "discrimination" on the basis of sex. 20 U.S.C. § 1681(a). As the Supreme Court has explained, "the term 'discriminate against' refers to distinctions or differences in treatment that injure protected individuals." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006); *see Muldrow v. City of St. Louis*, 601 U.S. 346, 354 (2024) (same). Because "the concept of discrimination includes an element of injury or harm," 89 Fed. Reg. at 33,815, the Department "does not interpret Title IX to prohibit all sex-based distinctions or separation," *id.* at 33,814. Rather, Title IX prohibits "only" those sex-based distinctions "that subject[] any person to legally cognizable injury— *i.e.*, more than de minimis harm." *Id.* The Rule thus explains that recipients generally may not separate or differentiate on the basis of sex where doing so causes harm.

At the same time, the Rule recognizes that in certain contexts Congress permitted recipients to separate or distinguish on the basis of sex, even if doing so causes cognizable harm. *See* 89 Fed. Reg. at 33,816. Those limited contexts permit, among other things, sex-separate fraternities and sororities, 20 U.S.C. § 1681(a)(6)(A); voluntary youth service organizations, *id.* § 1681(a)(6)(B); and living facilities,

*id.* § 1686.  The Rule effectuates Congress's decision to treat those contexts differently by exempting them from § 106.31(a)(2)'s de minimis harm standard.  89 Fed. Reg. at 33,816.[2]

The Rule further specifies how § 106.31(a)(2) applies to gender-identity discrimination.[3]  The Rule explains that, except as provided in the recognized exceptions, recipients must permit individuals to access sex-separate facilities and activities consistent with their gender identity because "prevent[ing] a person from participating in an education program or activity consistent with the person's gender identity subjects a person to more than de minimis harm on the basis of sex."  34 C.F.R. § 106.31(a)(2).  As relevant here, the Department has long recognized that sex separation "in the context of bathrooms or locker rooms[] is not presumptively unlawful sex discrimination" because a cisgender male suffers no sex-based harm from being excluded from a comparable women's restroom or locker room, and vice versa.  89 Fed. Reg. at 33,818.  That is why existing regulations permit sex-separate "toilet, locker room, and shower facilities," so long as the facilities are "comparable."

---

[2]  As the district court noted, one of these contexts is athletics.  App. 142, R. Doc. 54, at 44, Add. 44.  The district court correctly refused to consider plaintiffs' arguments about athletics because the Rule does not implicate the existing regulations regarding athletics, which are the subject of a different, ongoing rulemaking.  *See* 89 Fed. Reg. at 33,817.

[3]  Section 106.31(a)(2)'s protections are not limited to that context, instead applying "with equal force to all students." 89 Fed. Reg. at 33,818.

34 C.F.R. § 106.33. But it violates Title IX to bar transgender students from accessing restrooms that align with their gender identity because doing so *does* cause cognizable harm and because restrooms are not exempted from the statute's general nondiscrimination mandate. 89 Fed. Reg. at 33,818. Consistent with that conclusion, various courts have held—both before and after *Bostock*—that school policies that prevent students from accessing the restrooms that correspond to their gender identity violate Title IX. *See, e.g., A.C*, 75 F.4th at 769; *Grimm*, 972 F.3d at 616.

**2.** Plaintiffs argued below that Section 106.31(a)(2) is arbitrary and capricious, *see* R. Doc. 12 at 33-35, but those arguments are without merit. The arbitrary and capricious standard is "highly deferential" and requires only a rational explanation for the agency's actions. *Adventist Health Sys./SunBelt, Inc. v. U.S. Dep't of Health & Human Servs.*, 17 F.4th 793, 803 (8th Cir. 2021). The Rule's extensive discussion of § 106.31(a)(2)'s applications to sex-separate facilities—including issues related to safety, privacy, and compliance—easily satisfies this "highly deferential" standard. *Id.*

Section 106.31(a)(2)'s decision to treat contexts that Congress exempted from Title IX's prohibition differently from contexts where Congress did not was hardly arbitrary. *Contra* R. Doc. 12, at 34-35. The Rule requires that "a recipient must not provide sex-separate facilities or activities in a manner that subjects any person to legally cognizable injury"—including by preventing individuals from participating in a sex-separate program or activity consistent with their gender identity—"*unless there is a*

29

*statutory basis for allowing otherwise.*" 89 Fed. Reg. at 33,814 (emphasis added). That

recognition makes it plain that statutory exemptions to Title IX's general

nondiscrimination mandate can be relied on to allow sex separation.

No statutory exception exists, however, regarding bathrooms and locker

rooms. In enacting Title IX, *Congress* chose which contexts to exempt from the

statute's general nondiscrimination mandate. Congress "could have, but did not,"

include an exemption for sex-separate restrooms and locker rooms, 89 Fed. Reg. at

33,821, and § 106.31(a)(2) reflects that legislative choice to apply Title IX's general

nondiscrimination mandate to such contexts. The Supreme Court "has explained

many times" that courts may not "disregard [a statute's] plain terms based on some

extratextual consideration." *Bostock*, 590 U.S. at 673-74. As it has for decades, the

Department continues to permit recipients to maintain sex-separate restrooms and

locker rooms, *see* 34 C.F.R. § 106.33, but the ways in which recipients control access

to those facilities may not discriminate—*i.e.*, cause cognizable harm—on the basis of

sex, *id.* § 106.31(a)(2).

The Rule also thoroughly addressed concerns related to privacy and safety in

restrooms and locker rooms, explaining that the Department "agrees that recipients

have a legitimate interest in protecting all students' safety and privacy" and that such

goals are not "inconsistent with § 106.31(a)(2)." 89 Fed. Reg. at 33,820. The Rule

emphasized that nothing prevents recipients from taking steps "to ensure privacy and

safety for all students in a recipient's sex-separate facilities—steps that many recipients

already take consistent with their general codes of conduct, including rules prohibiting harassment, assault, and other forms of misconduct." *Id.* The Rule further explained that recipients may "offer[] single-occupancy facilities, among other accommodations, to any students who seek additional privacy for any reason." *Id.*

In responding to concerns about potential challenges associated with allowing transgender students to use bathrooms consistent with their gender identity, the Department reasonably explained that, based on its "enforcement experience, listening sessions with stakeholders, and its review of Federal case law," it disagreed that "transgender students pose a safety risk to cisgender students, or that the mere presence of a transgender person in a single-sex space compromises anyone's legitimate privacy interest." 89 Fed. Reg. at 33,820. The Department pointed to the experience of schools across the country who attested that, when "integrat[ing] transgender students into gender-specific facilities," "hypothetical fears and concerns" regarding safety and privacy have been "wholly unfounded in practice." Amici Curiae Brief of School Administrators at 18-19, *Grimm v. Gloucester Cty. Sch. Bd.*, No. 19-1952 (4th Cir. Nov. 25, 2019), 2019 WL 6341095, at *18-19; *see* 89 Fed. Reg. at 33,820; *see also* Brief of Amici Curiae California, et al. at 4-14, *Tennessee v. Cardona*, No. 24-5588 (6th Cir. Aug. 13, 2024), 2024 WL 3892972, at *4-14 (discussing "documented experience of school administrators in thirty-one states and the District of Columbia" showing that providing access to bathrooms and locker rooms consistent with gender identity does not result in "safety or privacy risks" or abuse). It also noted various

court decisions that have rejected "unsubstantiated" and "generalized" claims that "transgender persons' access to sex-separate spaces infringes on other students' privacy or safety." 89 Fed. Reg. at 33,820 (citing examples); *see Cruzan v. Special Sch. Dist. #1*, 294 F.3d 981, 984 (8th Cir. 2002) (per curiam). It was thus in no way arbitrary or capricious for the Department to conclude that a "recipient can make and enforce rules that protect all students' safety and privacy without also excluding transgender students from accessing sex-separate facilities and activities consistent with their gender identity." 89 Fed. Reg. at 33,820.

Nor does the Rule arbitrarily preclude recipients from taking reasonable measures to verify individuals' gender identity. *Contra* R. Doc. 12, at 34. The Department explained that recipients can rely "on written confirmation of the student's gender identity by the student or student's parent, counselor, coach, or teacher." 89 Fed. Reg. at 33,819 (noting also that recipients may rely on "a student's *consistent* assertion" (emphasis added)). Recipients may also request documentation such as an amended birth certificate or evidence of medical treatment, except to the extent requesting such documentation would be invasive or burdensome, or where "access to such documentation is prohibited by law." *Id.* Contrary to plaintiffs' suggestion, R. Doc. 12, at 17, that hardly amounts to a requirement that recipients allow individuals to access whatever bathroom they want without restriction.

**D.     The Rule's Hostile-Environment Harassment Standard Is Lawful And Raises No First Amendment Concerns.**

The district court incorrectly held that plaintiffs had a fair chance of showing that the Rule's definition of hostile-environment sex-based harassment misconstrued the statute and was inconsistent with the First Amendment. *See* App. 139-41, R. Doc. 54, at 41-43, Add. 41-43. The conclusion rests upon a basic misapprehension of how § 106.2 operates as well as a disregard for longstanding antidiscrimination practice and principles.

1.     It is well established that prohibited sex discrimination under Title IX includes sex-based harassment. *See Jackson*, 544 U.S. at 174. One form of such harassment is hostile-environment harassment, which § 106.2 defines as "[u]nwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity (*i.e.*, creates a hostile environment)." 34 C.F.R. § 106.2.

The Rule makes a handful of changes to the definition of hostile-environment harassment promulgated in 2020, but the standard announced in § 106.2 is hardly novel. *See* 89 Fed. Reg. at 33,497. It closely tracks the Department's "longstanding interpretation of Title IX" and accompanying "enforcement practice" prior to the 2020 amendments. *Id.* at 33,508; *see Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*, 66 Fed. Reg. 5512 (Jan. 19,

2001).[4]  It also mirrors the standards applied by courts in the context of "numerous

civil rights laws, including Title VII."  89 Fed. Reg at 33,508; *see Harris v. Forklift Sys.,*

*Inc.*, 510 U.S. 17, 21 (1993) (applying a "severe or pervasive" standard to conduct that

"alter[ed] the conditions" of employment (quotation marks omitted)).  That includes

this Court, which has long applied a standard prohibiting "severe or pervasive"

harassment in the Title VII context.  *See, e.g., Carter v. Chrysler Corp.*, 173 F.3d 693, 700

(8th Cir. 1999) (explaining that Title VII prohibits "discriminatory harassment so

severe or pervasive as to alter the conditions of employment and create a hostile

working environment"); *Paskert v. Kemna-ASA Auto Plaza, Inc.*, 950 F.3d 535, 538 (8th

Cir. 2020) (similar); *see also Wolfe*, 648 F.3d at 866 (explaining that "the Supreme

Court's interpretation of Title VII properly informs our examination of Title IX").

**2.**    The district court believed that plaintiffs had demonstrated a "fair

chance" of prevailing on their argument that § 106.2's hostile-environment standard is

invalid for departing from the standard for private damages actions announced in

*Davis ex rel. LaShonda D. v. Monroe County Board of Education*, 526 U.S. 629 (1999).  *See*

---

[4] Whereas the 2020 standard prohibited unwelcome sex-based conduct "determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person" access to an education program or activity, 34 C.F.R. § 106.30(a)(2) (2020), the Rule prohibits unwelcome sex-based conduct that "based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies" such access, 34 C.F.R. § 106.2.

App. 140-41, R. Doc. 54, at 42-43, Add. 42-43 (emphasis omitted).  But the district court's reliance on *Davis* was misplaced.

In *Davis*, the Supreme Court addressed the "scope of liability in private damages actions" under Title IX's judicially implied right of action, 526 U.S. at 641, a context in which courts have "a measure of latitude to shape a sensible remedial scheme that best comports with the statute," *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 284 (1998).  The question in *Davis* was "whether a district's failure to respond to student-on-student harassment in its schools can support a private suit for money damages." 526 U.S. at 639.  The Court thus addressed "the proper definition of 'discrimination' in the context of a private damages action." *Id.* at 649.  In that specific "context," *id.*, the Court concluded that schools "are properly held liable in damages only where they are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school," *id.* at 650.

Nothing in *Davis* suggested that the standard for damages liability that the Supreme Court announced as part of its authority to shape the judicially implied private right of action controls in the administrative-enforcement context.  Rather, the Court recognized that those contexts present different questions, explaining that "we are asked to do more than define the scope of the behavior that Title IX proscribes" in determining what conduct "support[s] a private suit for money damages." *Davis*,

526 U.S. at 639.  Indeed, the Court made clear that the standard reflected the appropriate limits on Title IX's judicially implied damages action, *see id.* at 640, which implicates issues of fair notice not presented in the administrative-enforcement context, *see Gebser*, 524 U.S. at 290 (explaining that federal funding can be terminated administratively only after "notice and unsuccessful efforts to obtain compliance" and limiting potential exposure to private damages liability under Title IX to "comparable conditions").  The *Davis* Court also repeatedly and approvingly cited the Department's then-applicable hostile-environment standard that applied to the Department's own enforcement efforts, 526 U.S. at 647-48, 651, which—like the Rule—defined prohibited sex-based harassment to include "severe, persistent, or pervasive" conduct, 62 Fed. Reg. 12,034, 12,034 (Mar. 13, 1997).  Far from affixing the meaning of any term in Title IX, the Court in *Davis* recognized that the circumstances under which recipients could be found liable for violating Title IX turned on the nature of the action and the relief sought.  Indeed, even the 2020 rule recognized that the "Department has regulatory authority to select conditions and a liability standard different from those used in the [*Davis*] framework" and thus did "not simply codify" *Davis.*  85 Fed. Reg. 30,026, 30,033 (May 19, 2020).

**3.**     In a single paragraph, the district court found that plaintiffs had a "fair chance of prevailing on their claim that the Rule violates the First Amendment." App. 141, R. Doc. 54, at 43, Add. 43 (emphasis omitted).  Yet prior to litigation over the Rule, no court had held that the standards long applied in the Title VII and Title

IX contexts for evaluating hostile-environment harassment contravened the First Amendment. To the contrary, the Supreme Court upheld "similar proscriptions on hostile environment harassment" in both contexts "without raising any First Amendment concerns." 89 Fed. Reg. at 33,506 (citing examples). That makes sense: A recipient can ensure that the classroom, like the workplace, is free from sex-based "intimidation, ridicule, and insult" without governing every "utterance," *Harris*, 510 U.S. at 21 (quotation marks omitted), and while safeguarding the right of individuals to engage in protected speech.

If any doubt remained, the Rule also makes clear that "nothing in the regulations"—including § 106.2—"requires or authorizes a recipient to violate anyone's First Amendment rights." 89 Fed. Reg. at 33,516; *see also* 34 C.F.R. § 106.6(d). Thus, while recipients must address hostile environments, the Department expressly recognized that the "First Amendment may in certain circumstances constrain the manner in which a recipient responds to sex-based harassment in the form of speech." 89 Fed. Reg. at 33,503.

Importantly, the Rule neither compels any particular speech by students or staff nor requires anyone to affirm "any particular view on any issue." 89 Fed. Reg. at 33,505. Instead it requires that schools receiving federal funding address sex-based harassment that is "subjectively and objectively offensive" and so "severe or pervasive" that it limits or denies a person's ability to access their education programs or activities. 34 C.F.R. § 106.2. Requiring schools to address sex-based harassment—

even where it involves speech—differs in kind from "telling" individual students and staff "what they must say." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 61 (2006). Indeed, the Rule makes clear that a recipient "must formulate, interpret, and apply its rules in a manner that respects the legal rights of students and employees when taking action to end sex-based harassment that creates a hostile environment." 89 Fed. Reg. at 33,503.

The district court was simply wrong to suggest that the Rule might "require government officials to use preferred gender pronouns." App. 141, R. Doc. 54, at 43, Add. 43 (quotation marks omitted). The Department explained that "whether verbal conduct constitutes sex-based harassment is necessarily [a] fact-specific" inquiry, but that "a stray remark, such as a misuse of language, would not constitute" harassment. 89 Fed. Reg. at 33,516. Even if there were circumstances in which the persistent or pronounced refusal to use pronouns consistent with a student's gender identity contributed to a claim of hostile-environment harassment, nothing in the Rule would "require[] or authorize[]" a school to mandate that anyone use particular pronouns or to compel silence of opposing viewpoints on questions related to gender identity in a way that would "violate anyone's First Amendment rights." *Id.*

The Rule's hostile-environment standard also poses no overbreadth problems. An overbroad law prohibits a "substantial amount of protected free speech, judged in relation to [its] plainly legitimate sweep." *Snider v. City of Cape Girardeau*, 752 F.3d 1149, 1158 (8th Cir. 2014) (quotation marks omitted). Facial invalidation of an

overbroad regulatory scheme is "strong medicine" that should only be used "sparingly and only as a last resort." *National Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998) (quotation marks omitted).

The Rule defines prohibited hostile-environment harassment in terms of "specific and required elements," 89 Fed. Reg. at 33,506, "using language with common usage and understanding" in the antidiscrimination context, *Rowles v. Curators of the Univ. of Mo.*, 983 F.3d 345, 358 (8th Cir. 2020). The Rule "covers only sex-based conduct that is unwelcome, both subjectively and objectively offensive, and so severe or pervasive that it limits or denies a person's ability to participate in" an education program or activity. 89 Fed. Reg. at 33,503. And it "only prohibit[s] conduct that meets all the[se] elements," requiring an evaluation based on the "totality of the circumstances" to ensure that no "required element[] … is ignored." *Id.* at 33,506.

Even if the Rule's prohibition on harassing conduct occasionally "sweeps in speech," 89 Fed. Reg. at 33,494, there is no indication that the standard prohibits a substantial amount of protected speech in an absolute sense or relative to the Rule's "plainly legitimate sweep," *Snider*, 752 F.3d at 1158 (quotation marks omitted). And "the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Members of the City Council of the City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984).

Nor does this Court's decision in *Beard v. Falkenrath*, 97 F.4th 1109 (8th Cir. 2024), provide any support for the district court's injunction. *Contra* App. 141, R.

39

Doc. 54, at 43, Add. 43.  In *Beard*, this Court found that a transgender inmate did not have a clearly established First Amendment right to have prison guards refer to her using her preferred pronouns, such that her claim was barred by qualified immunity. 97 F.4th at 1116-17.  In so holding, the Court explained that even if the guards' statements were "rude" and "humiliating," "the Constitution does not require prison officials to speak in a way an inmate prefers." *Id.* at 1117.  This case does not involve anyone's asserted constitutional right to be referred to using particular pronouns, but rather recipients' obligation to avoid sex discrimination under a federal statute.  And in any event, to the extent that *Beard* suggests that speakers have a First Amendment "right" to refer to transgender individuals using any particular pronouns, as noted above nothing in the Rule would "require[] or authorize[]" a school to "violate anyone's First Amendment rights."  89 Fed. Reg. at 33,516.

## II.     The Remaining Factors Weigh Against Preliminary Relief.

### A.     Plaintiffs Failed To Establish Irreparable Harm.

The "[f]ailure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).  To satisfy this requirement, "a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Iowa Utils. Bd. v. FCC,* 109 F.3d 418, 425 (8th Cir. 1996).  The district court erred in concluding that plaintiffs had made that showing.

1.    The district court incorrectly held that the plaintiff states would suffer irreparable harm in the form of compliance costs. *See* App. 143-44, R. Doc. 54, at 45-46, Add. 45-46. Plaintiffs did not even advance that theory of irreparable harm, *see* R. Doc. 12, at 38-42, and the district court cited no evidence to support it (because none was submitted). "Without more information about the financial impact of the Final Rule," this Court should "find no clear and present need for preliminary injunctive relief." *Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 78 F.4th 1011, 1018 (8th Cir. 2023).

2.    The district court further indicated that the states had "sufficiently demonstrated that the Final Rule, if allowed to take effect, would prevent enforcement of several enumerated laws, which suffices to show irreparable harm." App. 144, R. Doc. 54, at 46, Add. 46. The district court did not specify which states were likely to suffer this harm, nor did it indicate which laws it believed that the Rule preempted. To the extent plaintiffs suggested that the Rule would preempt their laws concerning sex-separate athletic teams, R. Doc. 12, at 38-39, the district court correctly recognized that the Rule "does not apply to sex-separate athletic teams permitted under § 106.41(b), as that regulation is carved out in § 106.31(a)(2)." App. 114, R. Doc. 54, at 16, Add. 16; *accord* App. 142, R. Doc. 54, at 44, Add. 44 (correctly recognizing that the "Rule carves out an exception for athletics regulation"). But even assuming that some unspecified state laws are inconsistent with the Rule, the Rule does not actually prevent the states from enforcing their laws; in implementing

Spending Clause legislation, it operates "in the nature of a contract: in return for federal funds, the [s]tates *agree* to comply with federally imposed conditions," *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) (emphasis added). States have no right to demand the federal government's money while rejecting the terms on which the federal government has elected to make that money available. In any event, "it is black-letter law that the federal government does not 'invade[ ]' areas of state sovereignty 'simply because it exercises its authority' in a way that preempts conflicting state laws." *Florida v. Department of Health & Human Servs.*, 19 F.4th 1271, 1291 (11th Cir. 2021) (alteration in original) (quoting *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 291 (1981)). "Indeed, to conclude otherwise would mean that a state would suffer irreparable injury from all … federal laws with preemptive effect." *Id.* at 1292.

    **3.**    The district court found that A.F. had "shown irreparable harm, not only with respect to her sense of personal privacy, but also with respect to the potential violation of her First Amendment rights." App. 144, R. Doc. 54, at 46, Add. 46. Yet the district court cited no evidence—and plaintiffs submitted none—showing that any such harms are "certain and great and of such imminence that there is a clear and present need for equitable relief." *Novus Franchising, Inc., v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013) (quotation marks omitted). Indeed, A.F.'s declaration does not indicate that she has ever interacted in any context whatsoever with any transgender individual—let alone that a transgender student actually attends her school. Her

declaration is instead based entirely on speculative and conclusory statements about things that might happen at unspecified points in the future. *See, e.g.*, App. 94, R. Doc. 9-3, at 6, ¶ 38 (indicating without foundation that she has "heard that this new Title IX rule will expose me to punishment for what I say or what I do not say"); App. 97, R. Doc. 9-3, at 9, ¶ 52 (speculating that at some unidentified point she might have to "stay in the same room and sleep in the same room" with a biological male on school trip). Such "[s]peculative harm" is patently inadequate. *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 779 (8th Cir. 2012).

## B. The Equities And The Public Interest Weigh Against An Injunction.

The remaining factors decisively favor the Department. Every time the federal government "is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (quotation marks omitted); *accord* App. 145, R. Doc. 54, at 47, Add. 47 (agreeing that the Department could "face irreparable harm if unable to enforce a valid regulation"). The harm is particularly pronounced here because the Rule effectuates Title IX's goals of "avoid[ing] the use of federal resources to support discriminatory practices" and "provid[ing] individual citizens effective protection against those practices." *Cannon v. University of Chi.*, 441 U.S. 677, 704 (1979). By contrast, plaintiffs would suffer no cognizable harm if the Rule were in force while this case proceeds—and in any case any such harms would

be dramatically outweighed by the government's interest in stamping out sex discrimination and ensuring all students' access to federally funded educational opportunities. *Cf. Winter*, 555 U.S. at 23 (public interest in naval training "outweighed" irreparable injury to wildlife).

At most, the district court observed that its injunction would maintain the status quo. *See* App. 145, R. Doc. 54, at 47, Add. 47. Under this Court's precedent, however, the equitable balancing test requires a court to evaluate "whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). In other words, the mere fact that an injunction would preserve the status quo is not itself a demonstration that the public interest favors an injunction, lest this test be satisfied in every case. Instead, as the Fifth Circuit has explained, "[m]aintenance of the status quo is only a sometimes concomitant of preventing irreparable harm" but is "never the touchstone for such injunctive relief." *Parks v. Dunlop*, 517 F.2d 785, 787 (5th Cir. 1975) (per curiam).

## III. At A Minimum, The Injunction Is Overbroad.

Finally, and at a minimum, the district court erred in entering an injunction that extended beyond the provisions that plaintiffs actually challenge, that plaintiffs established are likely unlawful, and that cause plaintiffs irreparable harm, for "injunctive relief should be no more burdensome to the defendant than necessary to

provide complete relief to the plaintiffs" on any valid claims. *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

**A.** As set out above, the district court at most found that plaintiffs had a "fair chance" of succeeding on their challenges to only those three provisions of the Rule that they challenged: 34 C.F.R. § 106.10, 34 C.F.R. § 106.31(a)(2), and 34 C.F.R. § 106.2's definition of hostile-environment harassment. But the Rule makes dozens of unrelated changes, most of which have nothing to do with gender identity. To identify a few specific examples:

- The Rule requires schools to provide pregnant and post-partum students with reasonable modifications and to inform pregnant students of their rights. 34 C.F.R. § 106.40(b).

- The Rule alters the definition of "complainant" to permit complaints by former students and employees who suffered discrimination while participating or attempting to participate in a covered program. *Id.* § 106.2; *see* 89 Fed. Reg. at 33,481-84.

- The Rule clarifies that funding recipients must prohibit retaliation, including peer retaliation, and take appropriate action in response to information about conduct that reasonably may constitute retaliation. 34 C.F.R. § 106.71.

- The Rule provides schools with more flexibility regarding the timing and structure of their grievance procedures. *Id.* §§ 106.45-106.46.

- The Rule affirms that recipients may disclose certain information to parents and legal guardians about their minor children. *Id.* § 106.44(j)(2).

The district court did not find that any of these provisions are unlawful, and there was no basis to enjoin the Department from enforcing them. Nor do any of those amendments depend in any way on the challenged provisions addressing gender-

identity discrimination and hostile-environment harassment. All of them would remain fully operative if the challenged provisions were enjoined in whole or in part, and each of them could easily have been issued as separate rules.

Contrary to the district court's reasoning, limiting injunctive relief to the provisions on which plaintiffs are likely to succeed would not be a "nearly impossible task," nor would it involve judicial "rulemaking." App. 148, R. Doc. 54, at 50, Add. 50. The Department included its straightforward determination in the Rule itself that the provisions of the Rule are "intended to operate independently of each other," confirming that pre-existing severability clauses in the Title IX regulations apply to the Rule. 89 Fed. Reg. at 33,848. Those clauses specify that "[i]f any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any person, act, or practice shall not be affected thereby." 34 C.F.R. §§ 106.9, 106.16, 106.48. The Rule thus expressly instructs that "the potential invalidity of one provision should not affect the other provisions." 89 Fed. Reg. at 33,848. And the Rule explains how the provisions not deemed unlawful, such as "the prohibition on retaliation," "operate separately from the clarification of the scope of sex discrimination under § 106.10." *Id.* If the district court believed that the three challenged provisions were unlawful and caused plaintiffs irreparable harm, the only thing it had to do was preliminarily enjoin the Department from enforcing those three provisions, while leaving every other provision of the Rule intact.

Nor does the district court's belief that § 106.10's explanation of the scope of sex discrimination "permeates the entire Rule," affect the conclusion. App. 148, R. Doc. 54, at 50, Add. 50; *see also* App. 139, R. Doc. 54, at 41, Add. 41 (contending that "the Final Rule's definition of sex discrimination is necessarily incorporated into the Rule's definitions of sex-based harassment and hostile environment sex-based harassment"). The Rule specifies that provisions not deemed unlawful "operate separately from the clarification of the scope of sex discrimination under § 106.10." 89 Fed. Reg. at 33,848. Thus, even if § 106.10 remained enjoined, every other provision of the Rule's amendments would continue to function by simply operating under Title IX's prohibition against discrimination "on the basis of sex," without any further regulatory gloss. That includes the unchallenged definitions in § 106.2; the requirements for Title IX Coordinators in § 106.8; the protections for pregnant and post-partum students in § 106.40; the provisions specifying recipients' obligations to respond to sex discrimination in § 106.44; the grievance-procedure provisions in § 106.45 and § 106.46; the duties of employers in § 106.57 and § 106.60; and the clarification regarding retaliation in § 106.71.

Indeed, the Title IX regulations have long operated without such a regulatory gloss. The Department's pre-existing regulations (amended in 2020) repeatedly reference "sex discrimination" without defining that term or clarifying its scope. *See, e.g.*, 34 C.F.R. § 106.8(a) (2020) (Title IX Coordinator); *id.* § 106.8(c) (2020) (grievance procedures); *id.* § 106.8(d) (2020) (extraterritoriality); *id.* § 106.71(a) (2020) (retaliation).

Earlier regulations, too, have long referred to "discrimination on the basis of sex" and "discrimination based on sex" without defining those terms. *E.g.*, 45 C.F.R. §§ 86.1, 86.3(a)-(b), 86.4(a), 86.6(a), 86.9(a), (c), 86.36(a)-(c), 86.37(a)(2), (b), 86.38(a), 86.39, 86.51(a)(4), 86.53, 86.56(b), 86.59 (1975). The term "sex discrimination" or its variants have been ubiquitous in the Department's Title IX regulations for decades, and both the Department and regulated entities have understood that term to simply incorporate Title IX's prohibition on discrimination "on the basis of sex." 20 U.S.C. § 1681(a). In fact, this Court (and many others) have interpreted and applied prohibitions on "sex discrimination" for decades without requiring any regulatory clarification of those terms. *See, e.g.*, *Does 1-2 v. Regents of the Univ. of Minn.*, 999 F.3d 571, 577-79 (8th Cir. 2021). All of this confirms that analogous provisions of the Rule would likewise remain fully operative even if § 106.10 were enjoined.

**B.**     Enjoining § 106.10 would be erroneous for yet another reason. Even putting aside plaintiffs' failure to demonstrate a likelihood of success as to this provision, *see supra* pp. 19-26, plaintiffs do not identify any harm they would suffer if they could not take undoubtedly discriminatory actions on the basis of gender identity (let alone the other bases listed in § 106.10, such as pregnancy or sex stereotypes). By attacking § 106.10's understanding of the scope of discrimination "on the basis of sex," plaintiffs claim that they can "discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Bostock*, 590 U.S. at 660. On plaintiffs' view, it would be perfectly lawful under

Title IX for them to punish transgender students "simply for being … transgender," *id.* at 651, by, for example, barring them from participating in the science fair, the marching band, or student government.  Plaintiffs have never suggested they wish to engage in such startling conduct or that they would be harmed by being required to refrain from it.  Rather, they claim harms related to restrooms or locker rooms, but it is a separate provision—34 C.F.R. § 106.31(a)(2), not § 106.10—that governs access to such spaces, *see supra* pp. 6-7.  This Court should thus at a minimum decline to endorse an injunction that bars enforcement of § 106.10, regardless of its view of plaintiffs' challenge to the separate provision governing sex-separate spaces at § 106.31(a)(2).

For similar reasons, even if the plaintiffs were correct on the merits, there would be no basis for enjoining § 106.2 beyond its definition of hostile-environment harassment as applied to discrimination on the basis of gender identity.  Section 106.2 defines several dozen terms used throughout the Title IX regulations.  Plaintiffs do not challenge any of these definitions besides hostile-environment harassment, and they principally object to the application of the standard in that definition to discrimination on the basis of gender identity, focusing on pronouns and salutations. *See* R. Doc. 12, at 29, 42-43.  There is therefore no basis for enjoining any more of § 106.2 than the definition of hostile-environment harassment as applied to gender-identity discrimination.

**C.** Finally, the Supreme Court's denial of the stay applications in the related proceedings does not justify plaintiffs' request for an overbroad injunction. As the Supreme Court emphasized, those applications were evaluated in an "emergency posture," on a "limited record" where "the burden is on the Government as applicant to show" entitlement to emergency relief. *Department of Educ. v. Louisiana*, 603 U.S. 866, 868 (2024) (per curiam). Here, the burden is on plaintiffs to justify their request for preliminary injunctive relief. As explained, plaintiffs cannot do so, and the district court went "beyond [its] authority to remedy the discrete harms alleged" by "blocking the Government from enforcing scores of regulations that [plaintiffs] never challenged and that bear no apparent relationship to [their] alleged injuries." *Id.* at 875 (Sotomayor, J., dissenting in part). And the Supreme Court majority plainly contemplated that despite denying the partial stay, "the Courts of Appeals w[ould] render their decisions" on the Department's appeals, including "its severability argument"—not that its denial had obviated the need for the courts of appeals to engage on those questions. *Id.* at 868 (per curiam).

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

*Of Counsel:*

SAYLER A. FLEMING
*United States Attorney*

LISA BROWN
*General Counsel*
*U.S. Department of Education*

MELISSA N. PATTERSON
JACK STARCHER
DAVID L. PETERS
*s/ Steven A. Myers*

STEVEN A. MYERS
*Attorneys, Appellate Staff*
*Civil Division, Room 7232*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-8648*
*Steven.A.Myers@usdoj.gov*

November 2024

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,674 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

Pursuant to Circuit Rule 28A(h)(2), I further certify that the brief has been scanned for viruses, and the brief is virus free.

*/s/ Steven A. Myers*
Steven A. Myers

## CERTIFICATE OF SERVICE

I hereby certify that on November 18, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*/s/ Steven A. Myers*
Steven A. Myers