# IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

STATE OF ARKANSAS, et al.,

Plaintiffs-Appellees,

v.

UNITED STATES DEPARTMENT OF EDUCATION., et al.,

Defendants-Appellants.

On Appeal from the United States District Court
for the Eastern District of Missouri

## APPELLANTS' ADDENDUM

*Of Counsel:*

LISA BROWN
*General Counsel*
*U.S. Department of Education*

BRIAN M. BOYNTON
*Principal Deputy Assistant*
*Attorney General*

SAYLER A. FLEMING
*United States Attorney*

MELISSA N. PATTERSON
JACK STARCHER
DAVID L. PETERS
STEVEN A. MYERS
*Attorneys, Appellate Staff*
*Civil Division, Room 7232*
*U.S. Department of Justice*
*950 Pennsylvania Avenue, NW*
*Washington, DC 20530*
*(202) 305-8648*

# **TABLE OF CONTENTS**

Memorandum and Order (R. Doc. 54) ...........................................................Add. 1

Order of Preliminary Injunction (R. Doc. 55) ..........................................Add. 57

20 U.S.C. § 1681 ..............................................................................................Add. 59

20 U.S.C. § 1682 ..............................................................................................Add. 62

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| THE STATE OF ARKANSAS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 4:24 CV 636 RWS |
| | ) | |
| UNITED STATES DEPT. OF EDUC., | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court upon plaintiffs' motion for stay and/or preliminary injunction.  ECF 9.  Defendants have filed an opposition to the motion, ECF 18, and plaintiffs have filed a reply brief in support of the motion.  ECF 21. Amicus briefs were also filed in support of defendants' opposition to the motion. ECF 34, 43.   The Court also ordered the parties to submit additional briefing and proposed orders for the Court's consideration, which appear in the record as ECF 39, 41, 47, 48, 49, 50.  The issues have been fully briefed.  Neither side requested an evidentiary hearing.  Therefore, the matter is ripe for resolution.

<u>Background</u>

Plaintiffs are six states[1] and one individual minor resident of Arkansas (A.F.).  Defendants are the United States Department of Education (Department), Miguel Cardona (the Secretary of Education), Catherine Lhamon (the Assistant Secretary for Civil Rights at the Department of Education), and Randolph Willis (the Deputy Assistant Secretary for Enforcement at the Department of Education) (collectively, the Department).[2]  The Department is charged with issuing rules effectuating Title IX.  20 U.S.C. § 1682.  Title IX prohibits recipients of federal funds from discriminating on the basis of sex in their education programs or activities.  20 U.S.C. § 1681(a).  On April 29, 2024, the Department issued a rule titled "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance," 89 Fed. Reg. 33,474 (Apr. 29, 2024) (the Final Rule or Rule).  ECF 9-1.  The Rule takes effect August 1, 2024.

As is relevant here, the Rule states that "discrimination on the basis of sex" includes "discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity," 89 Fed. Reg. at 33,886, and that the definition of hostile environment sex-based harassment includes "[u]nwelcome sex-based conduct that, based on the totality of the

---

[1] Arkansas, Missouri, Iowa, Nebraska, North Dakota, and South Dakota.

[2] The individual defendants are named in their official capacities only.

2

circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity." *Id.* at 33,884.

In the motion before the Court, plaintiffs seek to stay or preliminarily enjoin the Rule's effective date and prevent defendants from enforcing it pending the resolution of the underlying dispute.  Plaintiffs assert that the Rule violates the Administrative Procedure Act (APA) because it is contrary to law, exceeds the Department's statutory authority, and is arbitrary and capricious because "it requires States, schools, and universities to ignore biological sex in favor of self-professed 'gender identity' when it comes to bathrooms, locker rooms, athletics, and even speech." ECF 12 at 3.  Plaintiffs also contend that the Rule impermissibly expands the definition of sex-based harassment and contravenes controlling United States Supreme Court precedent, *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999).

Plaintiff States all receive federal funding for their schools and as a result are required to comply with the Final Rule. A failure to comply with Title IX may result in termination of federal funding.  20 U.S.C. § 1682.  Plaintiff States assert that the Final Rule conflicts with laws passed in their states.

Defendants respond that the Department's interpretation of discrimination "on the basis of sex" in the Rule straightforwardly applies the Supreme Court's

3

reasoning in the Title VII case, *Bostock v. Clayton County*, 590 U.S. 644 (2020), to Title IX.  Defendants contend that the Rule also appropriately recognizes distinctions between contexts in which Congress has specified exceptions to Title IX's prohibition on sex discrimination, and other contexts, "such as restrooms, " in which it has not.  ECF 18 at 10.  According to the defendants, the Rule permissibly explains that outside specified statutorily-mandated exceptions, separate or different treatment based on sex constitutes unlawful discrimination under Title IX only if it causes more than de minimis harm.  Defendants further contend that the definition of sex-based harassment is consistent with Title IX, the Department's enforcement authority, and prior standards of enforcement.  Defendants deny that the Rule's definition of sex-based harassment conflicts with any governing legal precedent or the First Amendment, or that it is otherwise arbitrary or capricious.

Standing

Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies."  *Murthy v. Missouri*, -- S. Ct. --, 2024 WL 3165801, at *7 (U.S. June 26, 2024).  The "case or controversy" requirement is "fundamental to the judiciary's proper role in our system of government."  *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (cleaned up).  Federal courts can only review statutes and executive actions when necessary "to redress or prevent actual or imminently threatened injury to persons caused by official violation of law."  *Summers v. Earth*

*Island Institute*, 555 U.S. 488, 492 (2009) (cleaned up).  "If a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so."  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006).

A proper case or controversy exists only when at least one plaintiff establishes that it has standing to sue.  *Raines*, 521 U.S. at 818.  That plaintiff must show that it has suffered, or will suffer, an injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (cleaned up).  The plaintiff "bears the burden of establishing standing as of the time it brought the lawsuit and maintaining it thereafter."  *Carney v. Adams*, 592 U.S. 53, 59 (2020) (cleaned up).  It must support each element of standing "with the manner and degree of evidence required at the successive stages of the litigation."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  At the preliminary injunction stage, then, the plaintiff must make a "clear showing" that it is "likely" to establish each element of standing.  *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008) (cleaned up).

Plaintiffs have established standing with respect to their claims.  As recipients of Title IX funds who will be required to comply with the Final Rule[3] or face loss of funding, plaintiff States have sufficiently alleged that the Final Rule will cause concrete, imminent injury redressable by the requested injunctive relief. "Government regulations that require or forbid some action by the plaintiff almost invariably satisfy both the injury in fact and causation requirements." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 382 (2024). Moreover, "when a statute is challenged by a party who is a target or object of the statute's prohibitions, there is ordinarily little question that the [statute] has caused him injury." *St. Paul Area Chamber of Commerce v. Gaertner*, 439 F.3d 481, 485 (8th Cir. 2006) (cleaned up).

Plaintiff States further allege that the Final Rule interferes with their sovereign right to create and enforce their own laws, imposes administrative costs and burdens, and requires plaintiff States to redesign or reconfigure their physical facilities.  ECF 1 at 31-42.  States have an interest in "the exercise of sovereign power over individuals and entities within the relevant jurisdiction—this involves the power to create and enforce a legal code, both civil and criminal." *Texas v.*

---

[3] New duties are additionally imposed under the Final Rule that were not required under the prior regulations, such as hiring Title IX coordinators, to make sure the Final Rule's new policies are carried out, which is sufficient to demonstrate injury for standing purposes. *See Kansas v. Dept. of Educ.*, 2024 WL 3273285, at *7 (D. Kan. July 2, 2024).

- Add. 6 -

*Cardona*, No. 4:23-CV-00604-O, 2024 WL 2947022, at *11 (N.D. Tex. June 11, 2024) (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982)).  Plaintiffs contend that the Department seeks to regulate Title IX in a manner that is not compatible with their state laws.  *See e.g.*, Ark. Code Ann. § 6-10-137(a) (requiring that overnight accommodations on school travel be separated by sex of the student); Ark. Code. Ann. § 6-21-120(b)(1) (requiring that schools designate multiple occupancy restrooms based on biological sex): Iowa Code § 280.33(2) (multiple occupancy restrooms or changing rooms must correspond to the student's sex); Neb. Rev. Stat. § 79-2,124 (separating toilet facilities, locker rooms, or living facilities by sex); N.D.C.C. § 15-10-68(1)-(2) (dormitory restrooms and showers must be designated exclusively for males or females and may only be used by members of that sex).

Further, plaintiff States have standing due to the alleged injuries to their state universities.  *See Arkansas v. Texas*, 346 U.S. 368, 370, 371 (1953); *Biden v. Nebraska*, 143 S. Ct. 2355, 2367-68 (2023).  They are also threatened with a loss of federal funding if they fail to comply with the Final Rule.  *See Tennessee v. Dept. of Educ.*, 104 F.4th 577, 589 (6th Cir. 2024); *Kansas v. Dept. of Educ.*, 2024 WL 3273285, at *7 (D. Kan. July 2, 2024).  The States have further sufficiently alleged that their injury is traceable to defendants and redressable by a favorable ruling. *See id.*; *Texas*, 2024 WL 2947022, at *18–19.

7

Defendants do not contest that plaintiff States have adequately alleged standing.  ECF 47, 50 at 15.

Plaintiff A.F. avers by declaration that her religious beliefs are that: there are two sexes; a person's sex cannot be changed;  and, she believes that she must use pronouns which align with a person's biological sex.  ECF 9-3 at 7.  A.F. has espoused these views at her school.  *Id.*  In light of the Final Rule, however, A.F. is fearful that she would be subject to investigation and potential discipline for continuing to speak her views.  *Id.* at 8.  A.F. also states that if she were forced to use restroom, locker room, or shower facilities with biological males, she would be deeply distressed, embarrassed, anxious, and would avoid these areas.  *Id.* at 8-9.  Based on these allegations in combination with her particularized and concrete allegations of potential imminent harm if she is required to share restrooms, locker rooms or shower facilities with biological males, the court finds that A.F. has standing to challenge the Final Rule.  *See Kansas*, 2024 WL 3273285, at *7.

<u>Standards Governing the Issuance of Preliminary Relief</u>

Section 705 of the APA provides that when a plaintiff shows that a stay or preliminary injunction would be necessary to prevent irreparable injury, the Court "may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings."  5 U.S.C. § 705. The Court's power under Section 705 to issue a stay

8

on agency action is limited "to the extent necessary to prevent irreparable injury." *Id.* (cleaned up).

The Court has discretion to issue a stay and considers four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (cleaned up).  The mere possibility of irreparable injury is not sufficient. *Id.* at 434–35.  When the government opposes the stay, the final two factors merge into an assessment of the public interest.  *Id.* at 435.

Besides its authority to issue a stay under the APA, the Court may alternatively issue a preliminary injunction under traditional equitable principles. This Court has broad discretion when ruling on preliminary injunctions. *Lankford v. Sherman*, 451 F.3d 496, 503 (8th Cir. 2006).  "A plaintiff seeking a preliminary injunction must establish four factors showing such relief is warranted: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest." *MPAY Inc. v. Erie Custom Comput. Applications, Inc*., 970 F.3d 1010, 1015 (8th Cir. 2020) (cleaned up).  When deciding whether to grant a preliminary injunction, courts ask "whether the balance

of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Nebraska v. Biden*, 52 F.4th 1044, 1046 (8th Cir. 2022) (cleaned up).  The movant bears the burden of demonstrating the preliminary injunction is warranted because a preliminary injunction is an "extraordinary remedy never awarded as of right."  *Progressive Techs., Inc. v. Chaffin Holdings, Inc*., 33 F.4th 481, 485 (8th Cir. 2022) (cleaned up).

Legislative History of Title IX and its Regulations

Title IX was enacted on June 23, 1972.  *See Tennessee v. Cardona,* 2024 WL 3019146, at *2 (E.D. Ky. June 17, 2024) (discussing the history of Title IX). Title IX was "patterned after Title VI of the Civil Rights Act of 1964."  *Cannon v. Univ. of Chicago*, 441 U.S. 677, 684–85 (1979).  When the provisions were introduced in the Senate for debate, Senator Bayh commented that the "heart of this amendment is a provision banning sex discrimination in educational programs receiving Federal funds. The amendment would cover such crucial aspects as admissions procedures, scholarships, and faculty employment." *N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 524 (1982) (quoting 118 Cong. Rec. 5,803 (1972)).  He stressed that "one of the great failings of the American educational system is the continuation of corrosive and unjustified discrimination against women."  118

Cong. Rec. at 5,803.  He urged the passage of the amendment to "root out. . . the social evil of sex discrimination in education."  *Id.* at 5,804.

The United States Department of Health, Education, and Welfare promulgated final regulations in 1975 concerning Title IX.  *North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 515-16 (1982).  The Title IX regulations included regulations in the area of athletics.  High schools and colleges were given three years to comply with the regulation on athletics which required equal opportunities for "members of both sexes" to participate in athletics.  34 C.F.R. § 106.41(c), (d).  The regulations also provided that a recipient "may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex."  34 C.F.R. § 106.33.

Amendments to the regulations became effective on November 24, 2006, to "clarify and modify Title IX regulatory requirements pertaining to the provision of single-sex schools, classes, and extracurricular activities in elementary and secondary schools."  *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 71 Fed. Reg. 62530-01 (Oct. 25, 2006) (codified at 34 C.F.R. § 106.34).

The regulations were amended again in 2020.  These amendments addressed sex-based harassment as a form of sex discrimination, a recipient's obligation to

address sexual harassment, grievance procedures, and implemented remedies for victims.  *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30026-01 (May 19, 2020) (codified in Title 34 of the Code of Federal Regulations).  This was the first time that the regulations addressed sexual harassment and included a definition for that term.  § 106.30.  In relevant part, Section 106.30 defines "sexual harassment" as "conduct on the basis of sex" that is "[u]nwelcome conduct determined by a reasonable person to be so severe, pervasive, *and* objectively offensive that it effectively denies a person equal access to the recipient's education program or activity." (emphasis added.)

After the Supreme Court issued its opinion in *Bostock*, the Department issued a memorandum regarding *Bostock* stating that the decision did not "construe Title IX," and that the "Title IX text is very different from Title VII text in many important respects," including that Title IX "contains numerous exceptions authorizing or allowing sex-separate activities and intimate facilities to be provided separately on the basis of biological sex or for members of each biological sex." *See Tennessee v. Dept. of Educ.*, 104 F.4th at 585-86 (quoting the January 8, 2021, memorandum).  That memorandum was later rescinded.  *Id.*

Following a change in administration, on March 8, 2021, President Biden issued an executive order tasking the Secretary of Education to review all existing

regulations, orders, guidance documents, policies and other similar agency actions to determine whether they were inconsistent with the Administration's policy that all students be guaranteed an educational environment free from discrimination on the basis of sex and discrimination on the basis of sexual orientation or gender identity. *See* Exec. Order No. 14,021, 86 Fed. Reg. 13,803 (Mar. 8, 2021).

On June 22, 2021, the Department published its interpretation of Title IX in the Federal Register. *Enforcement of Title IX of the Education Amendments of 1972 With Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of Bostock v. Clayton County*, 86 Fed. Reg. 32,637 (June 22, 2021). This document is preliminarily enjoined from being applied to several States, including plaintiffs Arkansas, Missouri, Nebraska and South Dakota. *Tennessee v. Dept. of Educ.*, 104 F.4th at 586. In addition, the Department is now permanently enjoined from enforcing it. *Texas v. Cardona,* 4:23CV604O, 2024 WL 2947022, at *51 (N.D. Tex. June 11, 2024)

On July 12, 2022, the Department published the Final Rule in the Federal Register and received more than 240,000 comments on the proposed regulations. *See Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33474, 33477 (Apr. 29, 2024). The Final Rule slightly modified some of the proposed regulations based on the comments. It is scheduled to take effect on August 1, 2024. According to

13

the Final Rule, the Department amended the regulations to "better align the Title

IX regulatory requirements with Title IX's nondiscrimination mandate."  89 Fed.

Reg. at 33,474.

Final Rule

Plaintiffs challenge the following provisions of the Rule.  First, the Rule

defines Title IX's prohibition on sex discrimination to include "discrimination on

the basis of sex stereotypes, sex characteristics, pregnancy or related conditions,

sexual orientation, and gender identity."  89 Fed. Reg. 33,474 (Apr. 29, 2024) (to

be codified at 34 C.F.R. 106.10).  The Department explains that "discrimination on

each of those bases is sex discrimination because each necessarily involves

consideration of a person's sex, even if that term is understood to mean only

physiological or 'biological distinctions between male and female.'"  *Id.* at 33,802

(quoting *Bostock*, 590 U.S. at 655); *see generally* 89 Fed. Reg. at 33,801–10

(explaining the bases for § 106.10 and *Bostock*'s application).

To implement this definition of sex discrimination, the Department instructs

that schools are permitted to maintain certain sex-segregated programs, activities,

and facilities.  *Id.* at 33,814.  (to be codified at 34 C.F.R. § 106.31(a)(2)).  The Rule

provides that—except in circumstances where Congress provided otherwise—Title

IX prohibits "distinctions or differences in treatment [on the basis of sex] that

injure protected individuals." *Id.* at 33,814 (brackets in original) (quoting *Bostock*,

14

590 U.S. at 681).  The Rule provides that a recipient must not provide sex-separate facilities or activities in a manner that subjects any person to "more than de minimis harm."  89 Fed. Reg. at 33,814.  The Department recognizes that sex "separation in certain circumstances, including in the context of bathrooms or locker rooms, is not presumptively unlawful sex discrimination" because separation of such facilities by sex generally imposes no more than de minimis harm on students.  *Id.* at 33,818; *see generally* 34 C.F.R. § 106.33.  However, the Department explains that sex separation that prevents a person from participating in an education program or activity consistent with their gender identity does cause more than de minimis harm and is therefore prohibited by Title IX.  *See* 89 Fed. Reg. at 33,814-16, 33,819 n.90.

Because Congress did not include same sex bathrooms or locker rooms in the statutory exceptions of Title IX in which different or separate treatment based on sex is permitted, *see, e.g.*, 20 U.S.C. § 1681(a)(6) (membership practices of certain social fraternities or sororities); *id.* § 1681(a)(4) (institutions focused on military training); *id.* § 1686 (educational institution's maintenance of "separate living facilities for the different sexes"), the Department concludes that denial of a transgender student access to a sex-separate bathroom or locker room consistent with that student's gender identity violates Title IX.  89 Fed. Reg. at 33,818-19.

The term "gender identity" is not defined in the new regulations, but the term is understood as "an individual's sense of their gender, which may or may not be different from their sex assigned at birth."  89 Fed. Reg. at 33,809.  The Rule does not specify how a school should determine a student's gender identity.  *Id.* at 33,819.  The Rule permits a school to rely on a student's "consistent assertion to determine their gender identity, or on written confirmation of the student's gender identity by the student or student's parent, counselor, coach or teacher."  89 Fed. Reg. at 33,819.  However, the Rule states that "requiring a student to submit to invasive medical inquiries or burdensome documentation requirements to participate in a recipient's education program or activity consistent with their gender identity imposes more than de minimis harm."  *Id.*

The Rule preempts all "State or local laws or other requirements" that conflict with its terms, 89 Fed. Reg. at 33,885, and it applies to any school "program or activity" regardless of whether the activity occurs within the school. *Id.* at 33,886 (to be codified at 34 C.F.R. 106.11).

The Rule does not apply to sex-separate athletic teams permitted under §106.41(b), as that regulation is carved out in § 106.31(a)(2).  Fed. Reg. at 33,819. However, it would apply to bathrooms and shower facilities, which are used in connection with athletics.  *Id.*  Further, it would also apply to single-sex classes or

portions of classes, such as physical education, that are allowed under the current regulations. *Id.*

The Rule redefines the term "sexual harassment" previously used in the regulations as "sex-based harassment," which means "sexual harassment and other harassment on the basis of sex, including on the bases described in [34 C.F.R.] § 106.10 . . . ." 34 C.F.R. 106.2 (effective Aug. 1, 2024). The Rule also redefines hostile environment sex-based harassment as "[u]nwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe *or* pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity." 89 Fed. Reg. at 33,884 (emphasis added). The Rule states that "sex-based harassment, including harassment predicated on sex stereotyping or gender identity, is covered by Title IX if it is sex-based, unwelcome, subjectively and objectively offensive, and sufficiently severe or pervasive to limit or deny a student's ability to participate in or benefit from a recipient's education program or activity (i.e., creates a hostile environment). Thus, harassing a student—including acts of verbal, nonverbal, or physical aggression, intimidation, or hostility based on the student's nonconformity with stereotypical notions of masculinity and femininity or gender identity—can constitute discrimination on the basis of sex under Title IX in certain circumstances." *Id.* at 33,516.

The Rule does not limit harassment to speech that occurs on school campuses and states that a recipient's obligations under Title IX are triggered whenever a school employee "has information about conduct among students that took place on social media or other platforms that reasonably may have created a sex-based hostile environment in the recipient's education program or activity."  89 Fed. Reg. at 33535.

The Rule also changes the grievance procedures for complaints of sex discrimination.  89 Fed. Reg. at 33,476.

Relevant Statutes

Title IX and the APA are the key statutes underlying the parties' dispute and are set out in relevant part below:

*Title IX*

**§ 1681. Sex**

**(a) Prohibition against discrimination; exceptions**

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance, except that:

**(1) Classes of educational institutions subject to prohibition**

in regard to admissions to educational institutions, this section shall apply only to institutions of vocational education, professional education, and graduate higher education, and to public institutions of undergraduate higher education;

**(2) Educational institutions commencing planned change in admissions**

in regard to admissions to educational institutions, this section shall not apply (A) for one year from June 23, 1972, nor for six years after June 23, 1972, in the case of an educational institution which has begun the process of changing from being an institution which admits only students of one sex to being an institution which admits students of both sexes, but only if it is carrying out a plan for such a change which is approved by the Secretary of Education or (B) for seven years from the date an educational institution begins the process of changing from being an institution which admits only students of only one sex to being an institution which admits students of both sexes, but only if it is carrying out a plan for such a change which is approved by the Secretary of Education, whichever is the later;

**(3) Educational institutions of religious organizations with contrary religious tenets**

this section shall not apply to an educational institution which is controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization;

**(4) Educational institutions training individuals for military services or merchant marine**

this section shall not apply to an educational institution whose primary purpose is the training of individuals for the military services of the United States, or the merchant marine;

**(5) Public educational institutions with traditional and continuing admissions policy**

in regard to admissions this section shall not apply to any public institution of undergraduate higher education which is an institution that traditionally and continually from its establishment has had a policy of admitting only students of one sex;

**(6) Social fraternities or sororities; voluntary youth service organizations**

this section shall not apply to membership practices--

**(A)** of a social fraternity or social sorority which is exempt from taxation under section 501(a) of Title 26, the active membership of which consists primarily of students in attendance at an institution of higher education, or

**(B)** of the Young Men's Christian Association, Young Women's Christian Association, Girl Scouts, Boy Scouts, Camp Fire Girls, and voluntary youth service organizations which are so exempt, the membership of which has traditionally been limited to persons of one sex and principally to persons of less than nineteen years of age;

### (7) Boy or Girl conferences

this section shall not apply to—

**(A)** any program or activity of the American Legion undertaken in connection with the organization or operation of any Boys State conference, Boys Nation conference, Girls State conference, or Girls Nation conference; or

**(B)** any program or activity of any secondary school or educational institution specifically for—

**(i)** the promotion of any Boys State conference, Boys Nation conference, Girls State conference, or Girls Nation conference; or

**(ii)** the selection of students to attend any such conference;

### (8) Father-son or mother-daughter activities at educational institutions

this section shall not preclude father-son or mother-daughter activities at an educational institution, but if such activities are provided for students of one sex, opportunities for reasonably comparable activities shall be provided for students of the other sex; and

### (9) Institution of higher education scholarship awards in "beauty" pageants

this section shall not apply with respect to any scholarship or other financial assistance awarded by an institution of higher education to any individual because such individual has received such award in any pageant in which the

attainment of such award is based upon a combination of factors related to the personal appearance, poise, and talent of such individual and in which participation is limited to individuals of one sex only, so long as such pageant is in compliance with other nondiscrimination provisions of Federal law.

**(b) Preferential or disparate treatment because of imbalance in participation or receipt of Federal benefits; statistical evidence of imbalance**

Nothing contained in subsection (a) of this section shall be interpreted to require any educational institution to grant preferential or disparate treatment to the members of one sex on account of an imbalance which may exist with respect to the total number or percentage of persons of that sex participating in or receiving the benefits of any federally supported program or activity, in comparison with the total number or percentage of persons of that sex in any community, State, section, or other area: *Provided,* That this subsection shall not be construed to prevent the consideration in any hearing or proceeding under this chapter of statistical evidence tending to show that such an imbalance exists with respect to the participation in, or receipt of the benefits of, any such program or activity by the members of one sex.

**(c) "Educational institution" defined**

For purposes of this chapter an educational institution means any public or private preschool, elementary, or secondary school, or any institution of vocational, professional, or higher education, except that in the case of an educational institution composed of more than one school, college, or department which are administratively separate units, such term means each such school, college, or department.

## § 1682. Federal administrative enforcement; report to Congressional committees

Each Federal department and agency which is empowered to extend Federal financial assistance to any education program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, is authorized and directed to effectuate the provisions of section 1681 of this title with respect to such program or activity by issuing rules, regulations, or orders of

general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken. No such rule, regulation, or order shall become effective unless and until approved by the President. Compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement, but such termination or refusal shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding has been made, and shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found, or (2) by any other means authorized by law: *Provided, however,* That no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means. In the case of any action terminating, or refusing to grant or continue, assistance because of failure to comply with a requirement imposed pursuant to this section, the head of the Federal department or agency shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action. No such action shall become effective until thirty days have elapsed after the filing of such report.

## § 1686. Interpretation with respect to living facilities

Notwithstanding anything to the contrary contained in this chapter, nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes.

## § 1689. Task Force on Sexual Violence in Education

### (a) Task Force on Sexual Violence in Education

Not later than September 1, 2022, the Secretary of Education, the Secretary of Health and Human Services, and the Attorney General shall establish a joint interagency task force to be known as the "Task Force on Sexual Violence in Education" that shall—

**(1)** provide pertinent information to the Secretary of Education, the Attorney General, Congress, and the public with respect to campus sexual violence prevention, investigations, and responses, including the creation of consistent, public complaint processes for violations of title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.) and section 1092(f) of this title;

**(2)** provide recommendations to educational institutions for establishing sexual assault prevention and response teams;

**(3)** develop recommendations for educational institutions on providing survivor resources, including health care, sexual assault kits, sexual assault nurse examiners, culturally responsive and inclusive standards of care, trauma-informed services, and access to confidential advocacy and support services;

**(4)** develop recommendations in conjunction with student groups for best practices for responses to and prevention of sexual violence and dating violence for educational institutions, taking into consideration an institution's size and resources;

**(5)** develop recommendations for educational institutions on sex education, as appropriate, training for school staff, and various equitable discipline models;

**(6)** develop recommendations on culturally responsive and inclusive approaches to supporting survivors, which include consideration of race, ethnicity, national origin, religion, immigrant status, lesbian, gay, bisexual, or transgender (commonly referred to as "LGBT") status, ability, disability, socio-economic status, exposure to trauma, and other compounding factors;

**(7)** solicit periodic input from a diverse group of survivors, trauma specialists, advocates from national, State, and local anti-sexual violence advocacy organizations, institutions of higher education, and other public stakeholders;

**(8)** assess the Department of Education's ability under section 902 of the Education Amendments of 1972 (20 U.S.C. 1682) to levy intermediate fines for noncompliance with title IX of the Education Amendments of 1972 (20

U.S.C. 1681 et seq.) and the advisability of additional remedies for such noncompliance, in addition to the remedies already available under Federal law; and

**(9)** create a plan described in subsection (c).

20 U.S.C. §§ 1681, 1682, 1686. § 1689.

The United States Supreme Court has summarized the legislative purposes

underlying the enactment of Title IX and its operation as follows:

> Congress enacted Title IX in 1972 with two principal objectives in mind: "[T]o avoid the use of federal resources to support discriminatory practices" and "to provide individual citizens effective protection against those practices." *Cannon v. City of Chicago,* 441 U.S. 677, 704 (1979). The statute was modeled after Title VI of the Civil Rights Act of 1964, *see id.* at 694–696; *Grove City College v. Bell,* 465 U.S. 555, 566 (1984), which is parallel to Title IX except that it prohibits race discrimination, not sex discrimination, and applies in all programs receiving federal funds, not only in education programs. *See* 42 U.S.C. § 2000d *et seq.* The two statutes operate in the same manner, conditioning an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of funds. *See Guardians Ass'n v. Civil Service Com'n of City of New York,* 463 U.S. 582, 599 (1983) (opinion of White, J.); *id.,* at 609 (Powell, J., concurring in judgment); *cf. Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 17 (1981).
>
> That contractual framework distinguishes Title IX from Title VII, which is framed in terms not of a condition but of an outright prohibition. Title VII applies to all employers without regard to federal funding and aims broadly to "eradicat[e] discrimination throughout the economy." *Landgraf v. USI Film Products,* 511 U.S. 244, 254 (1994) (internal quotation marks omitted). Title VII, moreover, seeks to "make persons whole for injuries suffered through past discrimination." *Ibid.* (internal quotation marks omitted). Thus, whereas Title VII aims centrally to compensate victims of discrimination, Title IX focuses more on "protecting" individuals from discriminatory practices carried out by recipients of federal funds. *Cannon, supra,* at 704.

*Gebser v. Lago Vista Independent School Dist.*, 524 U.S. 274, 286–87 (1998)

(cleaned up).

*APA*

### § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

**(1)** compel agency action unlawfully withheld or unreasonably delayed; and

**(2)** hold unlawful and set aside agency action, findings, and conclusions found to be—

**(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

**(B)** contrary to constitutional right, power, privilege, or immunity;

**(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

**(D)** without observance of procedure required by law;

**(E)** unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

**(F)** unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

The *Bostock* and *Davis* decisions

      The parties disagree about whether and how to apply these two Supreme Court decisions.  Plaintiffs contend that the Department's decisions to apply *Bostock* to Title IX and to expand the definition of sexual harassment beyond the language of *Davis* are contrary to law and in excess of its statutory authority. Defendants contend that its application of *Bostock* to Title IX is compelled by the plain language of the statute, and that *Davis* did not purport to define sexual harassment for purposes of administrative enforcement of Title IX.

      In *Bostock*, 590 U.S. at 651–52, the Supreme Court held:

> An employer who fires an individual for being homosexual or transgender fires that person for traits or actions it would not have questioned in members of a different sex. Sex plays a necessary and undisguisable role in the decision, exactly what Title VII forbids.

*Id.*  The Supreme Court defined its task as determining "the ordinary public meaning of Title VII's command that it is unlawful for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  *Id.* at 655 (cleaned up).  The Supreme Court acknowledged that "'sex' is the primary term in Title VII whose meaning the parties dispute."  *Id.* (cleaned up). The Supreme Court noted that the employers in the case used the term sex to "refer to 'status as either male or female [as] determined by reproductive biology,' while

the employees countered that the term bore a broader scope, capturing more than anatomy and reaching at least some norms concerning gender identity and sexual orientation."  *Id.* (cleaned up).  Ultimately, though, the Supreme Court found that "nothing in our approach to these cases turns on the outcome of the parties' debate, so we proceed on the assumption that 'sex' signified what the employers suggest, referring only to biological distinctions between male and female."  *Id.* (cleaned up).  As a result, the Court in *Bostock* concluded that "sex," as used in Title VII, refers to the "biological distinctions between male and female."  *Id.*

The Supreme Court went on to state that was "just a starting point.  The question isn't just what 'sex' meant, but what Title VII says about it.  Most notably, the statute prohibits employers from taking certain actions 'because of' sex.  And, as this Court has previously explained, the ordinary meaning of 'because of' is 'by reason of' or 'on account of.'"  *Bostock*, 590 U.S. at 656 (cleaned up).  Applying this test, the Supreme Court concluded that "an employer violates Title VII when it intentionally fires an individual employee based in part on sex."  *Id.* at 659.  That is because "at bottom, these cases involve no more than the straightforward application of legal terms with plain and settled meanings.  For an employer to discriminate against employees for being homosexual or transgender, the employer must intentionally discriminate against individual men and women in part because of sex.  That has always been prohibited by Title VII's

plain terms—and that should be the end of the analysis." *Bostock*, 590 U.S. at 662 (cleaned up).

The Supreme Court accepted the premise that "homosexuality and transgender status are distinct concepts from sex," *Bostock*, 590 U.S. at 669, but nevertheless concluded that "discrimination based on homosexuality or transgender status necessarily entails discrimination based on sex; the first cannot happen without the second." *Id.*

The Supreme Court rejected the idea of a "'canon of donut holes,' in which Congress's failure to speak directly to a specific case that falls within a more general statutory rule creates a tacit exception. Instead, when Congress chooses not to include any exceptions to a broad rule, courts apply the broad rule." *Id.* Addressing the issue of statutory interpretation, the Supreme Court explained that "when the meaning of the statute's terms is plain, our job is at an end. The people are entitled to rely on the law as written, without fearing that courts might disregard its plain terms based on some extratextual consideration. Of course, some Members of this Court have consulted legislative history when interpreting *ambiguous* statutory language. But that has no bearing here. Legislative history, for those who take it into account, is meant to clear up ambiguity, not create it. And as we have seen, no ambiguity exists about how Title VII's terms apply to the facts before us." *Bostock*, 590 U.S. at 673–74 (cleaned up).

28

Addressing the application of *Bostock* to other statutes, the Supreme Court

stated:

> The employers worry that our decision will sweep beyond Title VII to other federal or state laws that prohibit sex discrimination. And, under Title VII itself, they say sex-segregated bathrooms, locker rooms, and dress codes will prove unsustainable after our decision today. But none of these other laws are before us; we have not had the benefit of adversarial testing about the meaning of their terms, and we do not prejudge any such question today. Under Title VII, too, we do not purport to address bathrooms, locker rooms, or anything else of the kind. The only question before us is whether an employer who fires someone simply for being homosexual or transgender has discharged or otherwise discriminated against that individual "because of such individual's sex." As used in Title VII, the term "'discriminate against'" refers to "distinctions or differences in treatment that injure protected individuals." *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006). Firing employees because of a statutorily protected trait surely counts. Whether other policies and practices might or might not qualify as unlawful discrimination or find justifications under other provisions of Title VII are questions for future cases, not these.

*Bostock*, 590 U.S. at 681 (cleaned up).

Finally, the Supreme Court "emphatically rejected the view that, in the

context of an unambiguous statutory text, whether a specific application was

anticipated by Congress is irrelevant." *Bostock* 590 U.S. at 677 (cleaned up). That

is because "applying protective laws to groups that were politically unpopular at

the time of the law's passage often may be seen as unexpected. But to refuse

enforcement just because of that, because the parties before us happened to be

unpopular at the time of the law's passage, would not only require us to abandon

our role as interpreters of statutes; it would tilt the scales of justice in favor of the

strong or popular and neglect the promise that all persons are entitled to the benefit of the law's terms."  *Bostock*, 590 U.S. at 677–78 (cleaned up).

In *Davis*, 526 U.S. at 649–50, the Supreme Court decided that "having previously determined that 'sexual harassment' is 'discrimination' in the school context under Title IX, we are constrained to conclude that student-on-student sexual harassment, if sufficiently severe, can likewise rise to the level of discrimination actionable under the statute."  In reaching this decision, the Supreme Court explained:

> The requirement that recipients receive adequate notice of Title IX's proscriptions also bears on the proper definition of "discrimination" in the context of a private damages action. We have elsewhere concluded that sexual harassment is a form of discrimination for Title IX purposes and that Title IX proscribes harassment with sufficient clarity to satisfy *Pennhurst's* notice requirement and serve as a basis for a damages action. *See Gebser v. Lago Vista Independent School Dist.,* 524 U.S., at 281; *Franklin v. Gwinnett County Public Schools,* 503 U.S., at 74–75.  *See Bennett v. Kentucky Dept. of Ed.,* 470 U.S. 656, 665–666 (1985) (rejecting claim of insufficient notice under *Pennhurst* where statute made clear that there were some conditions placed on receipt of federal funds, and noting that Congress need not "specifically identif[y] and proscrib[e]" each condition in the legislation). The statute's other prohibitions, moreover, help give content to the term "discrimination" in this context.  Students are not only protected from discrimination, but also specifically shielded from being "excluded from participation in" or "denied the benefits of" any "education program or activity receiving Federal financial assistance." § 1681(a).  The statute makes clear that, whatever else it prohibits, students must not be denied access to educational benefits and opportunities on the basis of gender.

*Id.* at 649-50.  For these reasons, the Supreme Court held:

> We thus conclude that funding recipients are properly held liable in damages only where they are deliberately indifferent to sexual harassment, of which

they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school.

*Id.* at 650.

To decide whether "gender-oriented conduct rises to the level of actionable 'harassment' under Title IX thus depends on a constellation of surrounding circumstances, expectations, and relationships, including, but not limited to, the ages of the harasser and the victim and the number of individuals involved, *see* OCR Title IX Guidelines 12041–12042." *Davis*, 526 U.S. at 651.  The Supreme Court cautioned that "schools are unlike the adult workplace and that children may regularly interact in a manner that would be unacceptable among adults.  Indeed, at least early on, students are still learning how to interact appropriately with their peers.  It is thus understandable that, in the school setting, students often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students subjected to it.  Damages are not available for simple acts of teasing and name-calling among school children, however, even where these comments target differences in gender.  Rather, in the context of student-on-student harassment, damages are available only where the behavior is so severe, pervasive, and objectively offensive that it denies its victims the equal access to education that Title IX is designed to protect." *Id.* at 651-52.

The Supreme Court considered that "in theory, a single instance of sufficiently severe one-on-one peer harassment could be said to have such an effect," *Davis*, 526 U.S. at 652, but ultimately concluded that it was "unlikely that Congress would have thought such behavior sufficient to rise to this level in light of the inevitability of student misconduct and the amount of litigation that would be invited by entertaining claims of official indifference to a single instance of one-on-one peer harassment." *Id.* at 652-53. It concluded that such a rule "limiting private damages actions to cases having a systemic effect on educational programs or activities reconciles the general principle that Title IX prohibits official indifference to known peer sexual harassment with the practical realities of responding to student behavior, realities that Congress could not have meant to be ignored." *Id.* at 653 (cleaned up).

<u>Success on the Merits</u>

"While no single factor is determinative, the probability of success factor is the most significant." *Cigna Corporation v. Bricker*, 103 F.4th 1336, 1342 (8th Cir. 2024) (cleaned up). "A movant shows a likelihood of success on the merits when it demonstrates *a fair chance, not necessarily greater than fifty percent*, that it will ultimately prevail under applicable law." *Id.* at 1343 (cleaned up) (emphasis added).

Plaintiffs allege the Final Rule is contrary to law, exceeds the Department's statutory authority, and is arbitrary and capricious.  For purposes of deciding this motion, however, it is only necessary to determine whether plaintiffs have met their preliminary burden of demonstrating a *fair chance* that they will prevail on the merits of their claim that the Department exceeded its statutory authority and/or acted contrary to law when it applied the *Bostock* holding to interpret the phrase "on the basis of sex" in Title IX.

Similar cases have been filed in district courts across the country.  *See*, *Louisiana v. Dept. of Educ.*, 2024 WL 2978786, at *2 (W.D. La. June 13, 2024); *Tennessee v. Cardona*, 2024 WL 3019146 (E.D. Ky. June 17, 2024); *Kansas, v. Dept. of Educ.*, 2024 WL 3273285 (D. Kan. July 2, 2024); *Carroll Independent Sch. Dist. v. Dept. of Educ. et al*, Cause No. 4:24CV461-0 (N.D. Tex. July 11, 2024), ECF 46-2; *Texas, et al. v. United States, et al.*, 2:24CV86-Z (N. D. Tex. July 11, 2024), ECF 46-1.[4]  Each of these courts has preliminarily enjoined implementation of the Rule.  No court has denied the requested relief.

Upon due consideration of the foregoing authorities in light of the respective positions of the parties as outlined in the motion, supporting briefs, opposing briefs, amicus briefs, and the recent decisions of other courts confronting the same

---

[4] There is also a case pending in the Northern District of Alabama, *Alabama, et al. v. Cardona, et al*., 7:24CV533ACA.  That case was filed on April 29, 2024.  The district court has yet to issue a ruling on the plaintiffs' pending motion for preliminary injunction and/or stay.

issues,[5] the Court concludes that plaintiffs have met their preliminary burden of demonstrating a *fair chance* that they will prevail on the merits of at least this claim. *See Bricker*, 103 F.4th at 1344.

The Court must ultimately decide the meaning of sex under Title IX. *Loper Bright Enterprises v. Raimondo*, -- S. Ct. --, 2024 WL 3208360, at *22 (U.S. June 28, 2024). "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority." *Id.* at *22 (cleaned up). If an agency's interpretation of its statutory authority "is not the one the court, after applying all relevant interpretive tools, concludes is best, it is not permissible." *Id.* at *16 (cleaned up).

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Sex is not defined in Title IX, so the court must interpret the word "consistent with their ordinary meaning . . . at the time Congress

---

[5] Moreover, in a similar case the district court for the Southern District of Mississippi enjoined the implementation of a final rule issued by the United States Department of Health and Human Services ("HHS") on May 6, 2024, which purportedly implements the prohibition of discrimination set forth in Section 1557 of the Patient Protection and Affordable Care Act ("ACA"), 42 U.S.C. § 18116(a). *Tennessee, et al., v. Becerra, et al.*, Cause No. 1:24 CV161 LG-BWR (July 3, 2024) ECF 29. The ACA incorporates the provisions of Title IX in order to address sex discrimination in the healthcare field. *Id.* The district court concluded that plaintiffs demonstrated a substantial likelihood of success on the merits of their claim that HHS exceeded its statutory authority by applying the *Bostock* holding to Section 1557's incorporation of Title IX in its May 2024 Rule and issued a nationwide injunction.

enacted the statute." *Wisc. Cent. Ltd v. United States,* 585 U.S. 274, 284 (2018).

Title IX's scope is determined by examining its "text in light of context, structure, and related statutory provisions." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 558 (2005). After preliminary review and without ultimately deciding the issue, the Court concludes that plaintiffs have a *fair chance* of prevailing on their argument that the unambiguous plain language of Title IX and the legislative history support their position that the term "sex" means biological sex.

At the time Title IX was enacted in 1972, the term "sex" was understood to mean the biological distinctions between males and females. *See Tennessee*, 2024 WL 3019146, at *9 (citing *The American College Dictionary* 1109 (1970) and *Webster's Third New International Dictionary* 2081 (1971) (sex was defined as "one of the two divisions of organic [sic] esp. human beings respectively designated male or female"). The legislative history also supports a finding that the term "sex" refers to biological sex as one of the principal purposes of the statute was to root out discrimination against women in education. 118 Cong. Rec. at 5,803. The legislative history, which includes statistics on the number of women and men being included in various programs and activities, shows that Congress was concerned about the unequal treatment between men and women for admissions opportunities, scholarships, and sports. *Id.* at 5,803–06.

35

The plaintiffs' argument that the term "sex" means biological sex finds support in the text of the statute itself.  As plaintiffs point out, Title IX explicitly provides exceptions to the nondiscrimination mandate, including "father-son" and "mother-daughter" activities, which if provided for "one sex," shall not be precluded for the "other sex" as long as the "other sex" has opportunities for "reasonably comparable activities."  20 U.S.C. § 1681(a)(8).  Title IX also carves out an exception permitting an educational institution's maintenance of "separate living facilities for the different sexes."  *Id.* § 1686.  Finally, Title IX separately and explicitly refers to "transgender status" in § 1689.   As the foregoing authorities demonstrate, plaintiffs have a *fair chance* of prevailing on their claim that the term "sex" as used in Title IX refers to biological sex rather than "gender identity."

Defendants contend that even if the term "sex" in Title IX means biological sex, discrimination on the basis of gender identity is discrimination on the basis of biological sex, citing *Bostock*, 590 U.S. at 655.   Therefore, the Department contends that the Final Rule is not contrary to Title IX.

After preliminary review and without ultimately deciding the issue, the Court is persuaded that plaintiffs have a *fair chance* of prevailing on their argument that the reasoning of *Bostock*, a Title VII employment discrimination case, should not apply to Title IX.  *Bostock* held that "an employer who fires an

36

individual for being homosexual or transgender fires that person for traits or actions it would not have questioned in members of a different sex. Sex plays a necessary and undisguisable role in the decision, exactly what Title VII forbids." *Id.* at 651–52.

Although Title IX also prohibits sex discrimination, the Supreme Court has said that "Title VII is a vastly different statute from Title IX." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005) (cleaned up). "Title IX condition[s] an offer of federal funding on a recipient's promise not to discriminate, in what amounts essentially to a contract between the Government and the recipient. That contractual framework distinguishes Title IX from Title VII, which is framed in terms not of a condition but of an outright prohibition [of discrimination]." *Gebser*, 524 U.S. at 277 (cleaned up). Since Title IX was enacted pursuant to Congress's authority under the Spending Clause of the Constitution, *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 218 (2022), the Supreme Court "insists that Congress speak with a clear voice" when imposing conditions on the receipt of federal funds, "recognizing that there can, of course, be no knowing acceptance of the terms of the putative contract if a State is unaware of the conditions imposed by the legislation or is unable to ascertain what is expected of it." *Davis*, 526 U.S. at 640 (cleaned up).

In contrast, Title VII was enacted pursuant to the Commerce Clause, which grants Congress "expansive" regulatory power. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 549-50 (2012) (quoting U.S. Const. art. I, § 8, cl. 3)).  For these reasons, "the requirement that recipients receive adequate notice of Title IX's proscriptions bears on the proper definition of 'discrimination' in the context of a private damages action," *Davis*, 526 U.S. at 651 (cleaned up), whereas "whether a specific application [of Title VII] was anticipated is irrelevant." *Bostock* 590 U.S. 644 at 677 (cleaned up).

Significantly, Title IX includes several exceptions to the prohibition on sex discrimination that are not present in Title VII. *See* § 1681(a)(1)–(9).  These exceptions explicitly allow discrimination based on biological sex and demonstrate that not all differential treatment based on biological sex is discrimination under Title IX.  See 20 U.S.C. § 1686 (Title IX recipient may maintain "separate living facilities for the different sexes.").  Other courts considering this issue have concluded that this "instruction is the authoritative expression of Congress's view that separating the two sexes 'where personal privacy must be preserved' is not the type of discrimination prohibited by the statute." *Texas*, 2024 WL 2947022, at *32 (citing 118 Cong. Rec. 5,807 (Feb. 28, 1972)); *Kansas*, 2024 WL 3273285, at *10 (bathrooms and locker rooms impacted by the Final Rule appear to fall under the statutory category of "living facilities;" and given Congress's expressly stated

38

concern about privacy for students, it would be counterintuitive if that privacy only extended to students who lived in student housing) (citing *A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 770 (7th Cir. 2023)).  As another district court recently concluded, Title IX "prohibits differential treatment that disfavors, denies, excludes, or otherwise treats one biological sex worse than the other.  But Title IX does *not* prohibit differential treatment that allows for sex-separation or sex-specific benefits, provided that one biological sex is not treated as inferior to the other in the process." *Texas*, 2024 WL 2947022, at *31.

Further, Title IX is about schools, and as the Supreme Court has observed, "schools are unlike the adult workplace." *Davis*, 526 U.S. at 675 (cleaned up). The Supreme Court in *Bostock* also explicitly declined to address any other laws and the meaning of their terms or whether its holding would be applicable to "bathrooms, locker rooms, or anything else of the kind."  590 U.S. at 681 ("[N]one of these other [sex discrimination] laws are before us; we have not had the benefit of adversarial testing about the meaning of their terms, and we do not prejudge any such question today.") (cleaned up).

Given that notice is the touchstone of Title IX, the statute contains no definition of sex or express prohibition of discrimination on the basis of gender identity, and it expressly permits sex-based differential treatment in certain circumstances, plaintiff States have met their preliminary burden of establishing a

*fair chance* of prevailing on their argument that they lacked constitutionally sufficient notice that sex discrimination would be interpreted as including gender identity discrimination when they accepted federal funding under Title IX.

The Eighth Circuit Court of Appeals has not decided the issue at bar. However, it has stated that "Title VII cases provide guidance in evaluating Title IX claims." *Wolfe v. Fayetteville, Arkansas School Dist.*, 648 F.3d 860, 866 (8th Cir. 2011) (cleaned up).

There is circuit support for the Department's application of *Bostock* to Title IX. The Fourth Circuit Court of Appeals has cited *Bostock* for the proposition that "discrimination against a person for being transgender is discrimination 'on the basis of sex'" in violation of Title IX. *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020), *as amended* (Aug. 28, 2020). The Seventh Circuit Court of Appeals "applied *Bostock*'s reasoning to Title IX, and had no trouble concluding that discrimination against transgender persons is sex discrimination for Title IX purposes, just as it is for Title VII purposes." *A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 769 (7th Cir. 2023) (cleaned up). The Ninth Circuit Court of Appeals also concluded that *Bostock*'s reasoning applies to Title IX when it held that "discrimination on the basis of sexual orientation is a form of sex-based discrimination under Title IX." *Grabowski v. Ariz. Bd. of Regents*, 69 F.4th 1110, 1116 (9th Cir. 2023). However, the Supreme Court has

40

cautioned courts from "reading too much into too little," because "the language of an opinion is not always to be parsed as though we were dealing with language of a statute." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 373–74 (2023) (cleaned up).

After due consideration of all the foregoing authorities in light of the aforementioned differences between the two statutes, *Bostock*'s express disavowal to bathrooms or locker rooms or other statutory schemes, and in the absence of controlling authority, the Court concludes that plaintiffs have met their preliminary burden of demonstrating a *fair chance* of prevailing on their argument that *Bostock* should not apply to Title IX and that the Department exceeded its statutory authority and/or acted contrary to law in redefining "on the basis of sex" for purposes of Title IX.

The Court need not, and therefore does not, consider plaintiff's additional arguments regarding the Final Rule's alleged infirmities with respect to the Rule's definition of "sex" at this time given that its previous finding is sufficient to demonstrate success on the merits upon consideration of the pending motion for preliminary relief. And as the Final Rule's definition of sex discrimination is necessarily incorporated into the Rule's definitions of sex-based harassment and hostile environment sex-based harassment, the Court likewise concludes that plaintiffs have met their preliminary burden of demonstrating a *fair chance* of

41

prevailing on their argument that the Department exceeded its statutory authority in expanding the definition of sex-based harassment for the reasons set forth above.

In addition, plaintiffs argue the Final Rule's "severe or pervasive" standard, which considers speech or other expressive conduct that "limits" a person's ability to participate in a program to be discriminatory harassment, cannot be squared with Title IX as interpreted by the Supreme Court or the First Amendment. In *Davis*, the Supreme Court held that harassment becomes actionable discrimination "under the recipient's programs" when it "is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit" and when "the recipient exercises substantial control over both the harasser and the context." 526 U.S. at 633, 645 (cleaned up). The Final Rule states that the "final definition is not identical to *Davis* because the Department believes a broader standard is appropriate," 89 Fed. Reg. at 33,498 (cleaned up), because *Davis* was about private lawsuits whereas the Final Rule applies to "administrative enforcement." 89 Fed. Reg. at 33,560.

Given the Court's foregoing conclusion with respect to the definition of "sex" under Title IX, the Supreme Court's recent pronouncement regarding the limits of agency deference in *Loper Bright*, the Court concludes that plaintiffs have met their preliminary burden of demonstrating that they have a *fair chance* on prevailing on their claim that the Department's decision to expand the definition of

42

sexual harassment beyond the standard articulated in *Davis* based on an "administrative enforcement" justification exceeds the Department's statutory authority and/or is contrary to law.

Plaintiffs also contend that the Final Rule's harassment definition runs afoul of the First Amendment by unconstitutionally chilling speech. Other courts considering this issue have explained at length the potential ways in which the Final Rule's interpretation of sex in combination with its definition of sexual harassment may run afoul of the First Amendment. *See Tennessee, 2024 WL 3019146,* at *17-27; *Kansas*, 2024 WL 3273285, at *13-*15; *Louisiana*, 2024 WL 2978786, at *12-13;. After due consideration of these persuasive authorities, and given the Eighth Circuit's recent acknowledgment that the Constitution does not require government officials to use "preferred gender pronouns" "in part because the speaker has a First Amendment right" to even "the misuse of a pronoun," *Beard v. Falkenrath*, 97 F.4th 1109, 1117 (8th Cir. 2024) (cleaned up), the Court concludes that plaintiffs have met their preliminary burden of demonstrating at least a *fair chance* of prevailing on their claim that the Rule violates the First Amendment. For these reasons, the Court further finds that the plaintiffs have met their preliminary burden of demonstrating a *fair chance* of prevailing on their argument that the Department exceeded its statutory authority and/or acted in contravention of the law in expanding the definition of sex-based harassment.

43

Therefore, as to the first element necessary to secure preliminary relief, the Court concludes that plaintiffs have demonstrated success on the merits in that it finds that plaintiffs have met their preliminary burden of demonstrating a *fair chance* of prevailing on their argument that the Department exceeded its statutory authority in expanding the definitions of sex discrimination and sex-based harassment and that the Final Rule's interpretation of sex and discrimination are therefore contrary to Title IX.  *See Tennessee*, 2024 WL 3019146, at *13; *Louisiana*, 2024 WL 2978786, at *12; *Kansas*, 2024 WL 3273285, at *17.

Given that the Final Rule carves out an exception for athletics regulation, and there is a separate proposed rule that will amend the athletics regulation, the Court has not considered the arguments on athletics in its determination of whether plaintiffs have met their burden of demonstrating success on the merits of their claim that the Department acted without statutory authority in promulgating the Final Rule.  *See Louisiana*, 2024 WL 2978786, at *14 (declining to consider the effect of the Final Rule on sports at the preliminary injunction stage due to the proposed rule); *Kansas*, 2024 WL 3273285, at *11 (same).

Irreparable Harm

"Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages."  *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir.

44

2009).  To show irreparable harm, "a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Dakotans for Health v. Noem*, 52 F.4th 381, 392 (8th Cir. 2022) (cleaned up).  Plaintiffs must show the harm is "not merely a possibility but is likely to occur absent preliminary injunctive relief." *Morehouse Enterprises, LLC v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 78 F.4th 1011, 1017 (8th Cir. 2023) (cleaned up).

Like the other courts faced with this issue, the Court likewise concludes that plaintiffs have made a sufficient showing of irreparable injury if the Final Rule goes into effect on August 1.  Plaintiff States will incur costs that cannot be recouped including costs to update policies, materials, and hiring additional Title IX staff.  Further, States are required to comply with the Final Rule in a short period of time.  "Plaintiffs have sufficiently demonstrated that the compliance costs here are extraordinary due to the sweeping policy changes they are required to implement and the short timeframe in which they must do so.  And because the recovery of these costs would necessarily be barred, this factor weighs in favor of a finding of irreparable harm." *Tennessee*, 2024 WL 3019146, at *39 (citing *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring in part) ("[C]omplying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs."));

*Iowa Utilities Bd. v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996) ("The threat of unrecoverable economic loss, however, does qualify as irreparable harm."). Plaintiff States have also sufficiently demonstrated that the Final Rule, if allowed to take effect, would prevent enforcement of several enumerated laws, which suffices to show irreparable harm. The injury that results when a State cannot enforce "statutes enacted by representatives of its people" is irreparable. *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (cleaned up); s*ee also, Org. for Black Struggle v. Ashcroft*, 978 F.3d 603, 609 (8th Cir. 2020). Further, A.F. has shown irreparable harm, not only with respect to her sense of personal privacy, but also with respect to the potential violation of her First Amendment rights. *Louisiana*, 2024 WL 2978786, at *19. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Kansas*, 2024 WL 3273285, at *17.

For these reasons, the Court finds that plaintiffs are likely to suffer significant irreparable harm absent a preliminary injunction.

Public Interest/Balance of the Equities

Finally, the Court must determine whether plaintiffs have shown that the "balance of equities tips in their favor" and that "an injunction is in the public interest." *Winter*, 555 U.S. at 20. Courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of

46

the requested relief." *Id.* at 24.  When the party opposing the injunction is the federal government, the balance-of-harms factor merges with the public-interest factor.  *Nken*, 556 U.S. at 436.

Although the Department could face irreparable harm if unable to enforce a valid regulation, any interest the Department may have in enforcing a Final Rule that is contrary to law is not outweighed by plaintiffs' interests in having their constitutional rights protected.  *See Kansas*, 2024 WL 3273285, at *17.  Further, the Court concludes that it is in the public interest to prevent the violation of constitutional rights.  *Id.*

The Court also considers the fact that the regulations currently in effect have essentially "been unchanged for approximately 50 years. Therefore, it would be of relatively little harm to others to maintain the status quo pending the resolution of this lawsuit."  *Kansas*, 2024 WL 3273285, at *18 (quoting *Tennessee*, 2024 WL 3019146, *42).  The Court finds that these factors weigh in favor of plaintiffs.

Upon due consideration of the principles underlying preliminary injunctions and the magnitude of the Final Rule's impact upon plaintiffs, the importance of enjoining the Final Rule, and thus preserving the status quo, is imperative.  *See Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113, 113 n.5 (8th Cir. 1981).

The Court finds that in balancing the equities, the scale tips in favor of plaintiffs and of the issuance of preliminary relief.

47

Scope of Injunction

Plaintiffs seek to stay the Final Rule in its entirety and also ask the Court for a nationwide preliminary injunction.  In response, defendants ask the court to allow some parts of the Final Rule to go forward and to limit any injunctive relief to the plaintiff States and A.F.  Defendants point to the severability clause contained in each subsection in the current regulations which provides: "If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any person, act, or practice shall not be affected thereby."  34 C.F.R. §§ 106.9; 106.18; 106.48; *see also* 89 Fed. Reg. at 33,848.

"Traditionally, when a federal court finds a remedy merited, it provides party-specific relief, directing the defendant to take or not take some action relative to the plaintiff."  *United States v. Texas*, 599 U.S. 670, 693  (2023) (Gorsuch, J., concurring) (citing *Doran v. Salem Inn, Inc.*, 422 U. S. 922, 931 (1975)) ("[N]either declaratory nor injunctive relief can directly interfere with the enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs.").  Nationwide injunctions are a "relatively new phenomenon" and a phenomenon which the Supreme Court has yet to fully address.  *See Labrador v. Poe by & through Poe*, 144 S. Ct. 921, 925, 926 (2024) (Gorsuch, J., concurring) (discussing that "the propriety of universal injunctive

48

relief [is] a question of great significance that has been in need of the Court's attention for some time."). Problems with nationwide injunctions include depriving other courts of the opportunity to weigh in on these important questions, encouraging forum shopping, and circumventing rules governing class-wide relief. *Texas,* 599 U.S. at 694 (Gorsuch, J., concurring).

Issuing a nationwide injunction in this case would prevent the Final Rule from taking effect for those States not requesting such relief, as evidenced in the amicus brief. ECF 43. As previously indicated, this issue is currently being litigated in several districts and a nationwide injunction may result in one or more of those courts concluding that the plaintiffs can no longer show an irreparable injury in light of a decision granting universal relief. Courts in *Kansas*, *Tennessee*, and *Louisiana* refrained from issuing nationwide injunctions at least in part because of the ongoing litigation in other courts.[6]

In formulating a preliminary injunction, the court is to exercise its discretion and judgment in light of the "equities of a given case [and] the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579–80 (2017) (cleaned up). The "court need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular

---

[6] The Northern District of Texas has ordered additional briefing on the appropriate nature and scope of injunctive relief. *See Carroll Independent Sch. Dist*, Cause No. 4:24CV461-0 (ECF 46-2).

case." *Id.* at 580 (cleaned up). "Injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (cleaned up).

In light of the foregoing, the court declines to issue a nationwide preliminary injunction in this case.

Although the Court did not explicitly address all of the provisions in the Final Rule or the reasons advanced for its invalidity, given the Court's rulings with respect to the definition of sex discrimination and the fact that the definition permeates the entire Rule, the Court concludes that it would be a nearly impossible task to excise the remaining regulations without also eliminating those regulations that involve sex discrimination. *See*, *Tennessee*, 2024 WL 3019146, at *43; *Kansas,* 2024 WL 3273285, at *18. Nor would the potential harms to plaintiffs be fully remedied by enjoining only those portions of the Final Rule set out in defendants' proposed findings and conclusions. ECF 50 at 50. The Court also declines to parse out the sections that may remain as "rulemaking is exclusively within the purview of the Executive Branch." *Tennessee*, 2024 WL 3019146, at *43 (citing *Ayotte v. Planned Parenthood of Northern New England*, 546 U.S. 320, 330 (2006)) (courts must ask whether the legislature would have "preferred what is left of its statute to no statute at all"); *Kansas,* 2024 WL 3273285, at *18.

The Court notes that both the Fifth and Sixth Circuit Courts of Appeal declined to issue stays preventing the preliminary injunctions from taking effect in the *Tennessee* and *Louisiana* cases. *See Tennessee v. Cardona,* No. 24-5588 (6th Cir. Jul. 17, 2024); *Louisiana v. Dept. of Educ.*, No. 24-30399 (5th Cir. Jul. 17, 2024). ECF 52-1; 52-2. In both of those underlying cases, the district courts preliminarily enjoined the Final Rule from taking effect in its entirety. *See*, *Tennessee*, 2024 WL 3019146, at *43; *Louisiana*, 2024 WL 2978786, at *21.

The Sixth Circuit rejected the Department's request to narrow the scope of the preliminary injunction to the same provisions of the Final Rule proposed by defendants here as follows:

> Turn, then, to the scope of the preliminary injunction. As just shown, we disagree with the key premise of the Department's scope-of-the-injunction argument: its position that the court should not have extended the injunction to § 106.10's new definition of sex discrimination. Our reasoning shows at a minimum that the preliminary injunction properly extends to three central provisions of the Rule: §§ 106.10, 106.2's definition of hostile environment harassment, and 106.31(a).
>
> After that, the problem is that these provisions, particularly the new definition of sex discrimination, appear to touch every substantive provision of the Rule. It is thus unsurprising, as the Department fairly acknowledges, that there are "numerous" references to sex discrimination throughout the Rule. Dep't Supp. Br. 3. In reality, each of the remaining provisions that the Department seeks to implement on August 1 implicates the new definition of sex discrimination. Take the Rule's record-keeping provision, § 106.8(f), which requires schools to preserve any notice sent to the Title IX coordinator of "conduct that reasonably may constitute sex discrimination," as well as the investigation and grievance records for "each complaint of sex discrimination." 89 Fed. Reg. 33886. Or § 106.2's definition of sex-based harassment, which amounts to "a form of sex discrimination . . . including

51

on the bases identified in § 106.10, that [includes] . . . [h]ostile environment harassment." *Id.* at 33884. Or § 106.8, which imposes various new obligations on schools to comply with the new sex discrimination requirements: appointing Title IX coordinators, requiring training on the new scope of sex discrimination, and the like. *ld.* at 33885. Or § 106.11, which clarifies that the Rule generally requires schools to respond to sex discrimination in the United States and sometimes to sex discrimination elsewhere. *Id.* at 33886. Or § 106.40, which requires Title IX coordinators to "promptly and effectively prevent sex discrimination" by taking actions like ensuring access to lactation spaces. I*d.* at 33887-88. Or § 106.44, which requires any funding recipient "with knowledge of conduct that reasonably may constitute sex discrimination" to respond promptly with a series of corrective measures. *Id.* at 33888. Or the Rule's grievance procedures and retaliation provision, §§ 106.45-.46, .71, which impose new rules for dealing with complaints of sex discrimination, sex-based harassment, and retaliation for reporting the same. *ld.* at 33891-96.

Through it all, each of the provisions that the Department wishes to begin enforcing on August 1 implicates the new definition of sex discrimination. It is hard to see how all of the schools covered by Title IX could comply with this wide swath of new obligations if the Rule's definition of sex discrimination remains enjoined. Harder still, we question how the schools could properly train their teachers on compliance in this unusual setting with so little time before the start of the new school year.

The Department resists this conclusion. It argues that the schools could enforce these provisions by relying on the prior definition of sex discrimination under its rules and regulations. If we denied the stay only as to the three core provisions identified above, the Department thus hypothesizes, the pre-existing definition could govern the rest of the Rule on August 1. We see a few problems with this argument. One is that we do not know the meaning of that pre-existing definition. As the Department points out, even that definition is "the subject of separate litigation." Dep't Supp. Br. 3 n.1 (citing *Tennessee v. Dep't of Educ.*, 104 F.4th 577 (6th Cir. 2024)). Another problem is that the Department has not identified any evidence that it contemplated, during the rulemaking process, how the remainder of the Rule would apply without any of its core provisions. Yes, there are severability provisions that would apply to the Rule, and the Department considered the possibility that a court might sever § 106.10 from the rest of the Rule. 89 Fed. Reg. 33848. But it did not contemplate enforcement of

the Rule without *any* of the core provisions.  Nor is there any suggestion that the cost-benefit analyses underlying the Rule contemplated the idea of allowing these provisions to go into effect with a *different* definition of sex discrimination.

In addition, it bears emphasizing how the Department framed its arguments below.  The Department, to be sure, did identify the severability provisions. But it mainly used them to permit the new definition of sex discrimination to go into effect, not to allow other provisions to go into effect under the prior definition of sex discrimination.  In fact, the Department mentioned severability below in just a few lines of its briefs without telling the district court which other provisions should be severed. At least in the context of this emergency stay motion, we are uncomfortable granting more relief than the Department sought below. As shown, all of the provisions the Department now asks to go into effect implicate the new definition of sex discrimination.

*The other stay factors.*
The equities, too, favor this approach.  From an equitable perspective, educators should not be forced to determine whether this or that section of the new Rule must be followed when the new definition of sex discrimination might or might not touch the Rule.  The States presented evidence that rolling out hundreds of pages of a new rule on August 1, just before the start of the school year, will place an onerous burden on them- loads of time and lots of costs that will only escalate if we leave confusion over the States' obligations under the Rule.  That is particularly problematic given that the new definition of sex discrimination affects each provision of the Rule that the Department asked to go into immediate effect.

The States, to be sure, have acknowledged that some technical provisions of the Rule do not necessarily implicate the new definition of sex discrimination and are not already covered by prior regulations.  But the Department did not identify these provisions in its request for relief.  And with good reason, it appears.  The provisions merely include definitions of four terms ("parental status," "party," "pregnancy or related conditions," and "student with a disability"), as well as eight technical amendments to existing Title IX regulations.  *See* States' Supp. Br. 25 (citing § 106.3 [Amended]; § 106.15 (amending existing § 106.15); § 106.16 [Removed]; § 106.17 [Removed]; § 106.18 [Redesignated as § 106.16]; § 106.41

[Amended] (removing existing § 106.41(d)); § 106.46 [Redesignated as § 106.48]; and § 106.51 [Employment] (amending existing § 106.51(b)(6))).

Although a merits panel is free to consider whether the scope of the injunction should be narrowed to permit these technical provisions to go forward, the Department at this stage has not identified any harms that come from the preliminary injunction's coverage of these particular provisions. For that reason, and with the goal of avoiding any confusion that would come from enjoining all but the most technical portions of the Rule on the eve of a new school year, we will not exercise our "judicial discretion" to grant a stay on these points. *Nken*, 556 U.S. at 433.

We therefore deny the motion to stay the district court's preliminary injunction.

*Tennessee v. Cardona,* No. 24-5588 (6th Cir. Jul. 17, 2024).  ECF 52-1.  This reasoning also applies to the instant motion before the Court.

Finally, as noted by another district court, "nothing in this order limits the ability of any school to adopt or follow its own policies, or otherwise comply with applicable state or local laws or rules regarding the subjects addressed herein. Rather, it simply prohibits defendants from demanding compliance with the Final Rule by the schools affected by this order, or imposing any consequences for such schools' failure to comply with the Final Rule."  *Kansas*, 2024 WL 3273285, at *21; *see* ECF 43 at 5-6 (solutions implemented by school districts in other states to address nondiscrimination and privacy concerns include curtains and changing schedules).

Bond

Under Fed. R. Civ. P. 65(c), the Court may issue an injunction "only if" the moving party provides security sufficient to cover damages sustained by the enjoined party if that enjoined party were wrongly enjoined. The "amount of the bond rests within the sound discretion of the trial court." *Stockslager v. Carroll Elec. Coop. Corp.*, 528 F.2d 949, 951 (8th Cir. 1976) (cleaned up). "Courts in this circuit have almost always required a bond before issuing a preliminary injunction, but exceptions have been made where the defendant has not objected to the failure to require a bond or where the damages resulting from a wrongful issuance of an injunction have not been shown." *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Engr's*, 826 F.3d 1030, 1043 (8th Cir. 2016) (cleaned up). Defendants do not object to waiver of the bond requirement and have not demonstrated any costs or monetary damages that may result from issuance of the injunction. Under these circumstances, the Court will exercise its discretion to waive Rule 65(c)'s bond requirement. *See First Lutheran Church v. City of St. Paul*, 326 F. Supp. 3d 745, 769 (D. Minn. 2018).

Conclusion

Consistent with other federal courts across the country,

**IT IS HEREBY ORDERED** that plaintiffs' motion for preliminary injunction [9-2] is granted only as follows: pending final resolution of this case,

55

defendants, and all their respective officers, agents, employees, attorneys, and persons acting in concert or participation with them are enjoined from implementing, enacting, enforcing, or taking any action in any manner to enforce the Final Rule promulgated by the Department of Education titled "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance" and published in the Federal Register at 89 Fed. Reg. 33,474, set to become effective on August 1, 2024, against plaintiffs Arkansas, Missouri, Iowa, Nebraska, North Dakota, South Dakota and A.F., and is denied in all other respects.

**IT IS HEREBY ORDERED** that plaintiffs' alternative motion for stay [9-1] is denied without prejudice as moot.

**IT IS FURTHER ORDERED** that the court waives the security requirement of Federal Rule of Civil Procedure 65(c).

_____
RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE

Dated this 24th day of July, 2024.

56

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| THE STATE OF ARKANSAS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 4:24 CV 636 RWS |
| | ) | |
| UNITED STATES DEPT. OF EDUC., | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER OF PRELIMINARY INJUNCTION

In accordance with the Memorandum and Order issued this same date,

**IT IS HEREBY ORDERED** that defendants United States Department of Education, Miguel Cardona, Catherine Lhamon, and Randolph Willis, and all their respective officers, agents, employees, attorneys, and persons acting in concert or participation with them, are **ENJOINED** from implementing, enacting, enforcing, or taking any action in any manner to enforce the Final Rule promulgated by the Department of Education titled "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance" and published in the Federal Register at 89 Fed. Reg. 33,474, set to become effective on August 1, 2024, against plaintiffs Arkansas, Missouri, Iowa, Nebraska, North Dakota, South Dakota and A.F.

**IT IS FURTHER ORDERED** that the court waives the security

requirement of Federal Rule of Civil Procedure 65(c).


_____
RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE

Dated this 24th day of July, 2024.

2

**20 U.S.C. § 1681**

**§ 1681. Sex**

(a) Prohibition against discrimination; exceptions

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance, except that:

(1) Classes of educational institutions subject to prohibition

in regard to admissions to educational institutions, this section shall apply only to institutions of vocational education, professional education, and graduate higher education, and to public institutions of undergraduate higher education;

(2) Educational institutions commencing planned change in admissions

in regard to admissions to educational institutions, this section shall not apply (A) for one year from June 23, 1972, nor for six years after June 23, 1972, in the case of an educational institution which has begun the process of changing from being an institution which admits only students of one sex to being an institution which admits students of both sexes, but only if it is carrying out a plan for such a change which is approved by the Secretary of Education or (B) for seven years from the date an educational institution begins the process of changing from being an institution which admits only students of only one sex to being an institution which admits students of both sexes, but only if it is carrying out a plan for such a change which is approved by the Secretary of Education, whichever is the later;

(3) Educational institutions of religious organizations with contrary religious tenets

this section shall not apply to an educational institution which is controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization;

(4) Educational institutions training individuals for military services or merchant marine

this section shall not apply to an educational institution whose primary purpose is the training of individuals for the military services of the United States, or the merchant marine;

(5) Public educational institutions with traditional and continuing admissions policy

in regard to admissions this section shall not apply to any public institution of undergraduate higher education which is an institution that traditionally and

continually from its establishment has had a policy of admitting only students of one sex;

>(6) Social fraternities or sororities; voluntary youth service organizations

this section shall not apply to membership practices--

>>(A) of a social fraternity or social sorority which is exempt from taxation under section 501(a) of Title 26, the active membership of which consists primarily of students in attendance at an institution of higher education, or

>>(B) of the Young Men's Christian Association, Young Women's Christian Association, Girl Scouts, Boy Scouts, Camp Fire Girls, and voluntary youth service organizations which are so exempt, the membership of which has traditionally been limited to persons of one sex and principally to persons of less than nineteen years of age;

>(7) Boy or Girl conferences

this section shall not apply to--

>>(A) any program or activity of the American Legion undertaken in connection with the organization or operation of any Boys State conference, Boys Nation conference, Girls State conference, or Girls Nation conference; or

>>(B) any program or activity of any secondary school or educational institution specifically for--

>>>(i) the promotion of any Boys State conference, Boys Nation conference, Girls State conference, or Girls Nation conference; or

>>>(ii) the selection of students to attend any such conference;

>(8) Father-son or mother-daughter activities at educational institutions

this section shall not preclude father-son or mother-daughter activities at an educational institution, but if such activities are provided for students of one sex, opportunities for reasonably comparable activities shall be provided for students of the other sex; and

>(9) Institution of higher education scholarship awards in "beauty" pageants

this section shall not apply with respect to any scholarship or other financial assistance awarded by an institution of higher education to any individual because such individual has received such award in any pageant in which the attainment of such award is based upon a combination of factors related to the personal appearance, poise, and talent of such individual and in which participation is limited to individuals

of one sex only, so long as such pageant is in compliance with other nondiscrimination provisions of Federal law.

…

**20 U.S.C. § 1682**

## § 1682. Federal administrative enforcement; report to Congressional committees

Each Federal department and agency which is empowered to extend Federal financial assistance to any education program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, is authorized and directed to effectuate the provisions of section 1681 of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken. No such rule, regulation, or order shall become effective unless and until approved by the President. Compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement, but such termination or refusal shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding has been made, and shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found, or (2) by any other means authorized by law: *Provided, however,* That no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means. In the case of any action terminating, or refusing to grant or continue, assistance because of failure to comply with a requirement imposed pursuant to this section, the head of the Federal department or agency shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action. No such action shall become effective until thirty days have elapsed after the filing of such report.

## CERTIFICATE OF SERVICE

I hereby certify that on November 19, 2024, I electronically filed the foregoing

addendum with the Clerk of the Court for the United States Court of Appeals for the

Eighth Circuit by using the appellate CM/ECF system.  Service will be accomplished

by the appellate CM/ECF system.


*/s/ Steven A. Myers*
Steven A. Myers